**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| KATERRA INC., *et al.*, | ) Case No. 21-31861 (DRJ) |
| | ) |
| | ) (Jointly Administered) |
| *Debtors*. | ) |
| | ) |
| | ) |
| KATERRA INC., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors, | ) Adv. No. 22-03344 |
| | ) |
| | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| DELOITTE & TOUCHE LLP, | ) |
| *Defendant*. | ) |
| | ) |

<u>**DEFENDANT'S MOTION TO COMPEL ARBITRATION AND**</u>
<u>**DISMISS OR, IN THE ALTERNATIVE, STAY THE ADVERSARY PROCEEDING**</u>

> **This motion seeks an order that may adversely affect you.  If you object to the relief requested, you must respond in writing.  Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts .gov/ by April 3, 2023.  *See* ECF No. 13.  If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk by April 3, 2023.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

# TABLE OF CONTENTS

I.  Introduction ................................................................................................................1

II.  Background ................................................................................................................2

    A.  Between 2016 And 2020, Katerra Retains D&T To Perform Audit Services Under Several Engagement Letters ................................................2

    B.  Each Engagement Letter Requires The Parties To Arbitrate Any Disputes Relating To D&T's Audits .................................................................3

    C.  Katerra Files For Bankruptcy And This Court Confirms A Plan ...........................4

    D.  Katerra Invokes The Engagement Letters' Dispute Resolution Provisions............4

    E.  Katerra Disregards The Engagement Letters' Arbitration Provisions And Brings This Adversary Proceeding In Court .......................................................4

III.  The Claims Against D&T Must Be Arbitrated ................................................................5

    A.  The Federal Arbitration Act Requires Courts To Rigorously Enforce Arbitration Agreements ...............................................................................5

    B.  The Engagement Letters Require Arbitration Of Katerra's Claims ........................6

        1.  Katerra And D&T Entered Valid, Enforceable Arbitration Agreements ................................................................................6

        2.  The Parties Delegated Questions Of Arbitrability To The Arbitrator......................................................................................8

        3.  Even If The Court Could Decide Arbitrability, It Should Hold That Katerra's Claims Fall Under The Arbitration Provisions ..........................9

    C.  The Bankruptcy Code Does Not Override D&T's Right To Arbitrate Katerra's Claims .....................................................................................12

        1.  Katerra's Bankruptcy Does Not Allow The Court To Decline To Enforce Katerra's Agreement To Arbitrate Its Claims ............................12

        2.  Katerra's "Rejection" Of Certain Executory Contracts Does Not Eliminate D&T's Right To Arbitrate Katerra's Claims............................16

            a.  Katerra Did Not Reject The Engagement Letters .........................17

            b.  Even If Rejected, D&T Still Has A Right To Arbitrate And Katerra Remains Bound To Do The Same ...................................18

IV.  The Court Should Dismiss This Adversary Proceeding Or, In The Alternative, Stay It Pending Arbitration ..............................................................................25

V.  Conclusion ...............................................................................................................26

## I.      INTRODUCTION

1.   Katerra Inc. ("Katerra")[1] was driven to bankruptcy by the incompetence and fraud of its own management—including fraud perpetrated upon Deloitte & Touche LLP ("D&T"), its external auditor.   Despite admitting exactly these facts in a lawsuit against said management, Katerra now also seeks to blame D&T for its bankruptcy, claiming the bankruptcy could have been avoided if only D&T had done something different.   Those claims lack merit and would not survive even minimal scrutiny.   But this action cannot proceed in this Court for a more fundamental reason: Katerra signed engagement letters in which it unambiguously agreed that any claim arising from or relating to D&T's engagement as auditor "shall be settled by binding arbitration."   Those provisions resolve this motion.

2.   The arbitration provisions in the engagement letters are binding, valid, and enforceable. There can be no real dispute that Katerra's claims fall within the scope of those provisions.   And, in any event, any dispute over scope would itself be subject to arbitration.

3.   The sole reason Katerra offers for filing its claims in this Court is the belief that its bankruptcy should drive a different outcome.   Katerra is wrong.   Controlling Fifth Circuit authority confirms that claims like Katerra's—overwhelmingly non-core matters, all unrelated to the Bankruptcy Code's main concerns—must be arbitrated.

4.   In a single footnote in its complaint, Katerra nevertheless contends that it "is no longer bound" by its agreements to arbitrate because it "rejected" them under 11 U.S.C. § 365(a). Compl. ¶ 6 n.5 (citing *In re Highland Cap. Mgmt., L.P.*, 2021 WL 5769320, at *6 (Bankr. N.D.

---

[1]  This adversary proceeding is brought on behalf of Katerra and its related debtors "by and through" the plan administrator.  *See* ECF No. 1906.  For purposes of this motion, Deloitte refers to the plaintiff as "Katerra."  *See* ECF No. 1338 (confirmed plan providing that plan administrator will fill "the same fiduciary capacity as applicable to a board of directors and officers," and "shall be the sole representative, and shall act for" all debtors).

Tex. Dec. 3, 2021)).  That contention, and the outlier case law on which is relies, is fatally flawed.

For one thing, Section 365(a) permits debtors to reject only executory contracts and, like *Highland*,

Katerra simply assumes the engagement letters here are executory.  That is incorrect.  But the

Court need not reach that issue because Katerra's argument fails even if that assumption is credited.

As the great weight of authority has held—and as a recent Supreme Court decision supports—

rejection terminates neither the parties' arbitration rights nor this Court's obligation to enforce

those rights.  Under bankruptcy law and the Federal Arbitration Act, the right to arbitrate survives

any rejection and must be enforced as written.

5.   Simply put, Katerra has no tenable basis for disavowing the arbitration provisions in

the engagement letters, to which it agreed year after year, and instead filing its claims in this Court.

The Court should compel Katerra to arbitrate its claims and should dismiss this adversary

proceeding or, in the alternative, stay it pending arbitration.

## II.   BACKGROUND

### A.   Between 2016 And 2020, Katerra Retains D&T To Perform Audit Services Under Several Engagement Letters

6.   Katerra was founded in 2015 with high hopes of forging a "revolutionary approach"

that "would alter the landscape of the construction business."  Compl. ¶¶ 31, 34.  Katerra hired

D&T to serve as its auditor.  *See id.* ¶ 1.  During their relationship, the parties executed five

engagement letters, four of which appear relevant here.  *Id.*, Exs. B–D; *see* Shamah Decl., Exs. 1–

5.[2]  Under those engagement letters, D&T completed audits of Katerra's financial statements for

---

[2]   In its complaint, Katerra alleges that "Deloitte billed fees in the amount of ▮▮▮▮▮ to
Katerra for the 2016–2019 fiscal year audits alone."  Compl. ¶ 563.  As support, it attaches three
engagement letters and a fee schedule showing payments made for several audits.  *See id.*, Exs. B–
E.  Those engagement letters cover only 2017 through 2019, not 2016; and the fee schedule shows
that the ▮▮▮▮▮ in fees Katerra seeks to recover include nearly $2 million for a fifth audit in

the years ended December 31, 2016 through December 31, 2019, and Katerra paid D&T for those services up through the date it filed for bankruptcy.  Compl. ¶ 1; *id.*, Exs. B–E.  Although D&T was engaged to audit Katerra's year-end 2020 financial statements, it did not complete that audit due to Katerra's bankruptcy.

### B. Each Engagement Letter Requires The Parties To Arbitrate Any Disputes Relating To D&T's Audits

7.   Each engagement letter contained an identical provision requiring arbitration of any disputes.  Appendix E to each letter stated:

> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") ***shall be resolved by mediation or binding arbitration*** as set forth in the Dispute Resolution Provision.

*Id.*, Exs. B–D, App'x E § 7 (emphasis added).  This appendix also provided that the parties' arbitration rights would "survive the completion or termination of [the] engagement[s]."  *Id.* § 2.

8.   Appendix F to each letter included the "Dispute Resolution Provision," which provided the "dispute resolution process" that "shall apply to the fullest extent of the law."  *Id.*, App'x F.  Under that provision, the parties agreed to submit all disputes first to mediation and then, if mediation failed, agreed that "the Dispute ***shall be settled by binding arbitration***."  *Id.* (emphasis added).    They also agreed that "interpretation and enforcement of these arbitration procedures . . . shall be governed by the Federal Arbitration Act," and that all arbitrations "shall be conducted in accordance with the CPR rules for Non-Administered Arbitration."  *Id.*

---

2020, which the complaint barely mentions, which is not covered by any of the letters attached to the complaint, and for which Katerra did not pay in full.  *See id.*; *see also* Compl. ¶ 194.  To aid the Court's review despite these inconsistencies, Deloitte includes as exhibits to the Declaration of Adam Shamah correct copies of each engagement letter that could be considered relevant to Katerra's claims.

### C.   Katerra Files For Bankruptcy And This Court Confirms A Plan

9.   Unfortunately, "the Katerra Founders . . . utterly failed to execute" their ambitious plans.  Compl. ¶ 35.  As a result, Katerra's "potential was never realized."  *Id.*  In June 2021, Katerra filed for Chapter 11 bankruptcy.  *Id.* ¶ 1 n.1.  In October 2021, Katerra filed (and the Court confirmed) a third amended bankruptcy plan that "rejected" most "Executory Contract[s]" to which Katerra was a party.  *Id.* ¶ 6 n.5; *see* ECF No. 1338 at 23 ("Third Amended Plan"); ECF No. 1372 at 49–50 (order confirming plan).  That Plan provided that each "Executory Contract . . . not previously rejected, assumed, or assumed and assigned . . . shall be deemed automatically rejected pursuant to Section[] 365," *see* Third Amended Plan at 23, and a separately filed schedule did not list the engagement letters as "Assumed Executory Contracts," *see* ECF No. 1358, Ex. A. But neither the Plan nor the order confirming it listed the engagement letters specifically, or claimed them as either executory or rejected.  *See* Third Amended Plan at 23; ECF No. 1372.

### D.   Katerra Invokes The Engagement Letters' Dispute Resolution Provisions

10.  In March 2022—five months after the Court confirmed the Third Amended Plan "reject[ing]" most "Executory Contract[s]"—Katerra notified D&T that ███████████████████ ████████████████████████████████████████████.  *See* Shamah Decl., Ex. 6 at 1 & n.1 (███████████████████████████████████████████████).

████████████████████████████████████████████████████████

████████████████████████████████████████  *See id.* at 1 n.1.  ███

██████████████████████████████████████████████.

### E.   Katerra Disregards The Engagement Letters' Arbitration Provisions And Brings This Adversary Proceeding In Court

11.  ████████████████  Katerra did not proceed to "binding arbitration" as set forth in the engagement letters.  Instead, on December 31, 2022, Katerra filed an adversary proceeding in

4

this Court.  A year-and-a-half after entering bankruptcy, and more than a year after this Court confirmed the Third Amended Plan, Katerra now claims that "Deloitte's failures were a substantial factor in causing Katerra . . . to fail and ultimately file for bankruptcy."  Compl. ¶ 5.  In its complaint, Katerra alleges that D&T failed to perform the services promised under the 2016–2019 engagement letters, made misrepresentations about its work during that period, and acted negligently while doing so—and seeks more than $1 billion in damages, plus ████████ in fees it paid to D&T.  *See id.* ¶¶ 1–18, 227–566.  Based on those allegations, Katerra asserts six causes of action: (1) avoidance and recovery of constructive fraudulent transfers (that is, the fees paid to D&T) based on D&T's failure to perform adequately under the engagement letters, (2) breach of contract, (3) professional negligence/malpractice, (4) negligent misrepresentation, (5) aiding and abetting breach of fiduciary duty, and (6) unjust enrichment.  *See id.* ¶¶ 634–684.[3]

## III.    THE CLAIMS AGAINST D&T MUST BE ARBITRATED

12. Katerra repeatedly agreed to arbitrate any disputes with D&T.  Those provisions are valid, enforceable, and cover the claims asserted here.  And nothing about the bankruptcy proceedings vitiates D&T's right to the benefit of those bargains.  The Court should compel arbitration of all the claims Katerra has asserted against D&T.

### A.    The Federal Arbitration Act Requires Courts To Rigorously Enforce Arbitration Agreements

13. The Federal Arbitration Act ("FAA") governs the enforcement of arbitration agreements.  Section 2 provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  And Section 4 requires that courts generally "shall" compel arbitration "in

---

[3] On February 8, 2023, the Court approved a stipulation between the parties and extended Deloitte's time to file a responsive pleading to March 3, 2023.  *See* ECF No. 13.

accordance with the terms of the agreement" to arbitrate. *Id.* § 4; *see CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). Together with the rest of the FAA, these provisions codify the "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted), under which "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration," *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010) (citation omitted). The FAA "leaves no place for the exercise of discretion"; it requires courts to "rigorously enforce" the terms of written arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 221 (1985).

14. When considering a motion to compel arbitration, courts are limited to a narrow inquiry. The court must decide "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Polyflow, LLC v. Specialty RTP, LLC*, 993 F.3d 295, 302 (5th Cir. 2021) (citation omitted). But when an arbitration agreement delegates questions about arbitrability to the arbitrator, courts must only evaluate the validity of the agreement and may not reach the second question. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."). Then, "[i]f the court finds that the parties agreed to arbitrate" certain claims, it "must consider whether any federal statute or policy renders the claims nonarbitrable." *Polyflow*, 993 F.3d at 302 (citation omitted).

**B.    The Engagement Letters Require Arbitration Of Katerra's Claims**

**1.    Katerra And D&T Entered Valid, Enforceable Arbitration Agreements**

15. Deciding "whether there is a valid arbitration agreement is a question of state contract law and is for the court." *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018) (citation omitted). "To form a valid contract under New York law, there must be an offer, acceptance,

consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (citation omitted).[4]   The arbitration provisions here are valid and enforceable.

16. Katerra executives signed each engagement letter cited in Katerra's complaint.  *See* Compl., Exs. B–D at 4 (showing signatures by Katerra's CFO on the engagement letters).  The validity of these engagement letters is not in dispute; Katerra relies on them to assert its breach-of-contract claim against D&T.  *See* Compl. ¶¶ 37, 196–206, 647–652.

17. In each engagement letter, D&T agreed to "



," and Katerra agreed to

*Id.*, Exs. B–D, at 1–2.  The parties also agreed, in Appendix E, that "[a]ny controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a 'Dispute') shall be resolved by mediation or binding arbitration."  *Id.*, Exs. B–D, App'x E § 7; *see also id.* (providing that Appendix E was "part of the engagement letter[s] to which [it was] attached").  And they agreed, in Appendix F, that if mediation failed, the dispute "shall be settled by binding arbitration."  *Id.*, Exs. B–D, App'x F.  These are binding, enforceable agreements to arbitrate.

---

[4]  The parties agreed that New York law would apply to disputes under the engagement letters.  *See* Compl., Exs. B–D, App'x F.  But there is no relevant difference on this point between New York law and the laws of Texas (where Katerra brought these claims) or California (where Katerra received and appears to have signed each engagement letter).  *See, e.g.*, *Huckaba v*, 892 F.3d at 689 ("Under Texas law, a binding contract requires: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." (citation omitted)); *Norcia v. Samsung Telecomm. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) ("[U]nder California law, the essential elements for a contract are (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration" (cleaned up)); *see also* Compl., Exs. B–D at 1 (each letter addressed to Menlo Park, California).

## 2.    The Parties Delegated Questions Of Arbitrability To The Arbitrator

18. If Katerra disputes whether its claims fall within the scope of these arbitration provisions (and that seems unlikely), the Court must send that dispute to arbitration because the parties agreed to arbitrate questions of arbitrability.  "[W]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."  *Henry Schein*, 139 S. Ct. at 529.  The Fifth Circuit "will not assume that the parties agreed to arbitrate arbitrability '[u]nless the parties clearly and unmistakably [so] provide.'"  *Petrofac, Inc. v. DynMcDermott Petroloeum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).  But it has recognized that parties *do* "clearly and unmistakably" delegate arbitrability by "expressly incorporat[ing] into their arbitration agreement" American Arbitration Association ("AAA") rules "stat[ing] that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'"  *Id.* (collecting cases).

19. Each engagement letter here effectively does just that.  Each provides that "[t]he arbitration . . . shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration."  Compl., Exs. B–D, App'x F.  And those rules are nearly identical to the AAA rules in *Petrofac*.  They provide that the arbitral "[t]ribunal shall have the power to hear and determine challenges to its jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement" and "jurisdictional challenges with respect to both the subject matter of the dispute and the parties to the arbitration."  *2018 CPR Non-Administered Arbitration Rules*, CPR Dispute Resolution 17 (Mar. 1, 2018), https://tinyurl.com/26uenr7p (Rule 8.1).  If anything, they go beyond the AAA rules by extending the arbitrators' power to cover similar questions about "the contract of which an arbitration clause forms a part."  *Id.* (Rule 8.2).  So even if Katerra somehow disputes

8

whether the arbitration provisions cover its claims, the Court should refer those questions to arbitration, too. *See, e.g.*, *Hurley v. Emigrant Bank*, 2019 WL 5537330, at *9 (N.D. Tex. Oct. 25, 2019) ("[I]n line with *Petrofac*, this Court holds that express incorporation of the CPR Rules establishes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Shirley v. FMC Techs., Inc.*, 2020 WL 5995695, at *5 (W.D. Tex. Oct. 9, 2020) (same, and noting that *Petrofac* involved "a virtually identical AAA Rule").

### 3. Even If The Court Could Decide Arbitrability, It Should Hold That Katerra's Claims Fall Under The Arbitration Provisions

20. In any event, Katerra's claims clearly fall under the engagement letter's arbitration provisions. "[I]f the parties have contracted to arbitrate, there is a 'presumption' that their disputes 'will be deemed arbitrable unless it is clear that the arbitration clause has not included them.'" *Polyflow*, 993 F.3d at 303 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995)). "[T]he party resisting arbitration shoulders the burden of proving that the dispute is not arbitrable." *Id.* (cleaned up). And courts must "resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration." *Pennzoil Explortion & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (citation omitted). "[A]rbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Id.* (citation omitted).

21. The engagement letters require the parties to arbitrate any claim "arising out of or relating to" those letters or the resulting engagement. *See* Compl., Exs. B–D, App'x E § 7. Courts have characterized this language as "broad" and with "expansive reach." *Pennzoil*, 139 F.3d at 1067; *see, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967); *Polyflow*, 993 F.3d at 303–04 (collecting cases). That, in turn, means that such provisions embrace not only claims arising directly from the contract between D&T and Katerra, but also "all disputes

between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Pennzoil*, 139 F.3d at 1067; *see Ford Motor Co. v. Ables*, 207 F. App'x 443, 447 (5th Cir. 2006) (compelling parties to arbitrate negligence and fraud claims because they "touch[ed] matters covered by" a contract containing a "broad" arbitration clause).

22. Each cause of action asserted in Katerra's complaint arises out of or relates to the parties' engagement letters.  All purport to challenge the services D&T provided to Katerra under the engagement letters, whether D&T complied with its contractual and other professional obligations to Katerra in carrying out those services, and whether Katerra received the full value of the services it paid for under the engagement letters.

- Count Two (for breach of the engagement letters) is perhaps the most obvious.  *See, e.g.*, Compl. ¶ 650 ("Deloitte . . . materially breached its contractual obligations and duties to Katerra by, among other things, failing to render audit, review and related services as set forth in the Engagement Letters.").

- Counts One and Six (for constructive fraudulent transfer and unjust enrichment) concern D&T's services under the engagement letters, and whether they were worth what Katerra paid for them.  *See, e.g.*, *id.* ¶ 637 (alleging, in connection with Count One, that "Katerra did not receive reasonably equivalent value from Deloitte in exchange for [Katerra's payments] due to Deloitte's failure to perform its audit services as contractually required"); *id.* ¶ 683 (claiming, "[i]n the alternative to the breach of contract claim," that Deloitte "fail[ed] to fulfill its professional responsibilities and fail[ed] to comply with GAAS" in performing its audits under the engagement letters).

- Counts Three and Four (for professional negligence/malpractice and negligent misrepresentation) allege that D&T "was negligent in conducting its audits" under the engagement letters, and in making certain "promises and representations about the work it would perform" under those letters. *E.g.*, *id.* ¶¶ 656, 663.

- Finally, Count Five (for aiding and abetting breach of fiduciary duty) challenges D&T's decision to issue unqualified (or "clean") opinions upon auditing Katerra's financial statements under the engagement letters. *E.g.*, *id.* ¶ 677.

23. D&T will also be able to raise defenses based on the engagement letters. Each made clear that Katerra's management was  *Id.* But in a separate lawsuit against its former officers and directors, Katerra alleges that those insiders actively concealed information from D&T to secure the very audit opinions upon which Katerra now sues. *See generally* Complaint, *Katerra Inc. v. Marks*, No. 22 Civ. 271 (UNA), ECF No. 6 ¶¶ 376–382, 483–494 (D. Del. filed Mar. 8, 2022) ("*Marks* Complaint"). D&T will therefore be able to argue, based on these provisions, that the harms of which Katerra now complains stem from Katerra management's breaches—not D&T's services.

24. So while the Court should not reach whether Katerra's claims fall within the engagement letters' broad arbitration requirements—and while Katerra seems unlikely to argue otherwise—the question answers itself.

C.    **The Bankruptcy Code Does Not Override D&T's Right To Arbitrate Katerra's Claims**

1.    **Katerra's Bankruptcy Does Not Allow The Court To Decline To Enforce Katerra's Agreement To Arbitrate Its Claims**

25. The FAA requires courts to enforce arbitration provisions according to their terms unless that statutory directive is "overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). "The burden is on the party opposing arbitration, however, to show that Congress intended to preclude" enforcement of an arbitration agreement for the particular "rights at issue." *Id.* at 227. Nothing in the Bankruptcy Code explicitly refers to, let alone displaces, the FAA. And even assuming that an atextual "conflict between arbitration and [bankruptcy's] underlying purposes" could displace the FAA's clear text, *id.*, there is no conflict between the Bankruptcy Code and the arbitration of Katerra's claims in this case.[5]

26. Katerra's complaint overwhelmingly centers on state-law tort and contract claims alleging deficiencies with D&T's audit work. It seeks more than $1 billion in expectation and consequential damages in connection with those causes of action, while purporting to assert one relatively nominal (████████) claim for "fraudulent transfer" under the Bankruptcy Code. *See* Compl. ¶¶ 48, 635, Prayer for Relief. But that claim itself is based on D&T's alleged failure to perform fully under the engagement letters, just like its state-law claims. *See id.* ¶ 637 (premising fraudulent transfer claim on "Deloitte's failure to perform its audit services as contractually

---

[5] Deloitte recognizes the Fifth Circuit recently reaffirmed that courts can decline to compel arbitration when there is a conflict between the FAA's plain text and the Bankruptcy Code's broad purposes. *See In re Henry*, 944 F.3d 587, 592 (5th Cir. 2019). As explained below, there is no such conflict here. But if the Court declines to compel arbitration, Deloitte preserves its right to challenge the Fifth Circuit's conclusion in later proceedings in this case, especially in light of the Supreme Court's decision in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624, 1627 (2018) (holding that implicit conflict between the FAA and another statute could not justify refusing to compel arbitration absent evidence of "clear and manifest" congressional intent to override the FAA, and noting that the "Court has rejected *every* such effort to date" (citation omitted)).

required").  Allowing Katerra to escape its agreements to arbitrate by including this repackaged contract claim would be the proverbial tail wagging the dog.  It would flout the FAA's strong policy favoring arbitration while doing nothing to further the goals of the Bankruptcy Code.  And it would invite gamesmanship, encouraging other debtors to employ similar tactics in hopes of evading their prior agreements to arbitrate.

27. ***Non-Core Proceedings***.  The Fifth Circuit analyzes core and non-core matters differently.  When it comes to non-core issues, "a bankruptcy court has no discretion to refuse to compel . . . arbitration."  *In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002); *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1066 (5th Cir. 1997) (this rule "has been universally accepted").

28. Counts Two through Six of the complaint allege common law claims that do not derive at all from the Bankruptcy Code.  *See* Compl. ¶¶ 647–684.  These are non-core claims, and this Court accordingly has "no discretion to refuse to compel the arbitration" of them.  *In re Gandy*, 299 F.3d at 495; *see, e.g.*, *In re Trevino*, 599 B.R. 526, 532, 542, 551 (Bankr. S.D. Tex. 2019) (finding breach-of-contract claim non-core and compelling arbitration).

29. ***Core Proceedings***.  When it comes to "'core' proceedings," a bankruptcy court has some discretion not to compel arbitration, but only if "[the *McMahon*] standard" has been met.  *In re Nat'l Gypsum*, 118 F.3d at 1067.  As the Fifth Circuit has made clear, "[c]ertainly not all core bankruptcy proceedings are premised on provisions of the Code that 'inherently conflict' with the [FAA]; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code."  *Id.*  Courts may only "refuse to enforce an otherwise applicable arbitration agreement when [1] the underlying nature of a proceeding derives *exclusively* from the provisions of the bankruptcy code *and* [2] the arbitration of the proceeding conflicts with the purpose of the Code."  *In re Gandy*, 299 F.3d at 495 (emphasis added).

13

30. Katerra has a single claim—fraudulent transfer under 11 U.S.C. §§ 544(b), 548(b), 550, 551, and Texas law—that is styled as a "core" matter. *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33 (2014) (quoting 28 U.S.C. § 157(b)(2)(H)). But that is just the beginning of the analysis. *See In re Gandy*, 299 F.3d at 495. And because Katerra's fraudulent transfer claim flunks both of *Gandy*'s requirements, it belongs in arbitration—along with Katerra's non-core claims.

31. *First*, Katerra's fraudulent transfer claim does not derive exclusively from the Code. As "[t]he United States Supreme Court has held," "fraudulent conveyance claims ostensibly brought under the Bankruptcy Code 'are quintessentially suits at common law' that 'resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate.'" *In re Cardali*, 2010 WL 4791801, at *8 (Bankr. S.D.N.Y. Nov. 18, 2010) (indirectly quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)). Such is the case here. Katerra's fraudulent transfer claim merely echoes the other, common law claims in the complaint—that Katerra paid D&T for services D&T performed inadequately—but adds that Katerra was (or became) insolvent as a result. *See* Compl. ¶¶ 637, 640. This "is simply an attempt to reclaim fees paid to" D&T, which does not require any bankruptcy analysis. *In re Rescue Rangers, LLC*, 582 B.R. 669, 681 (Bankr. E.D. Va. 2018) (compelling arbitration of Section 548 claim based on allegation that "[t]he Debtor did not receive reasonably equivalent value in exchange for any payments made to [the defendant]" (citations omitted)); *see Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys.*, 2015 WL 9302843, at *8 (S.D. Tex. Dec. 18, 2015) (compelling arbitration because fraudulent transfer claim under Section 548 "derive[d] from [debtor's] pre-petition legal rights" and substantially implicated "non-bankruptcy contractual and tort issues" (citations omitted)).

14

32. *Second*, compelling arbitration would not "jeopardize the objectives of the Bankruptcy Code." *In re Nat'l Gypsum*, 118 F.3d at 1067. It would not risk derailing a complex bankruptcy proceeding by allowing a creditor or other claimant to assert claims *against* the debtor outside of bankruptcy. *Cf., e.g.*, *In re Brazos Elec. Power Cooperative, Inc.*, No. 21-30725 (DRJ), ECF No. 1902 at 7–8, 37–39 (Bankr. S.D. Tex. June 17, 2022) (denying request to lift automatic stay to allow creditor "to commence an arbitration against the Debtor to resolve a pending claim objection," given "overriding policy considerations" at stake). *But see In re Fieldwood Energy LLC*, No. 20-33948 (MI), ECF No. 2006 at 4 (Bankr. S.D. Tex. Aug. 24, 2021) (granting motion to lift automatic stay to allow commencement of arbitration against debtor, given that "arbitration generally applies in bankruptcy cases, unless there's something unique about the dispute such that it must be resolved as part of the bankruptcy process itself"). Katerra is the one who voluntarily invoked the engagement letters to *sue D&T*.

33. Nor would it defeat "the goal[s] of centralized resolution of purely bankruptcy issues" or of avoiding "piecemeal litigation." *In re Nat'l Gypsum*, 118 F.3d at 1069. Enforcing the arbitration provisions here would mean only that all of Katerra's claims—none of which are "purely bankruptcy issues"—will be resolved in a single arbitral proceeding. Katerra has *already* multiplied the forums for litigating its claims by filing another complaint against its former directors and officers in the District of Delaware. *See Marks* Complaint, *supra*. Katerra is capable of litigating *those* claims outside of bankruptcy court (in a district court in another district); it is thus hard to see how the Bankruptcy Code's goals could be jeopardized by enforcing Katerra's agreement to resolve *these* claims outside of bankruptcy court (in arbitration). Compelling arbitration would simply provide a consolidated, efficient, and agreed-upon path to resolving all of Katerra's claims against D&T.

34. When fraudulent transfer claims fall short of the standard set out in *Gandy* and *National Gypsum* (like Katerra's claim), courts compel arbitration.  *See, e.g.*, *Elite Precision*, 2015 WL 9302843, at *7–*8, *10 (compelling arbitration of fraudulent transfer claims under Sections 548 and 550 because "[e]ven analyzed as 'core,'" they did not "derive exclusively from the Bankruptcy Code" and arbitration would "further, rather than conflict with," the Bankruptcy Code's goals); *In re Winimo Realty Corp.*, 270 B.R. 108, 123–25 & n.12 (Bankr. S.D.N.Y. 2001) (applying *National Gypsum* to hold similarly); *In re Tomberlin*, 2017 WL 410337, at *3–*4 (Bankr. M.D. Ala. Jan. 30, 2017) (same where Section 548 claim was "essentially one for breach of contract"); *see also In re Cardali*, 2010 WL 4791801, at *8 (collecting cases).

35. And this case is fundamentally different from those in which courts refuse to send fraudulent transfer claims to arbitration.  In *Gandy*, for example, the common law claims were "peripheral" and "inconsequential relative to the bankruptcy causes of action."  *In re Gandy*, 299 F.3d at 497, 500.  The opposite is true here: the common law claims predominate.  And unlike in *Gandy*, there is no concern that D&T has "conceal[ed]" any assets, "will not honor" any judicial or arbitral orders, or seeks to shield allegedly fraudulent transfers from collection.  *Id.* at 492, 498–99.  There is no suggestion that Katerra's fraudulent transfer claim "represent[s] very nearly the entirety of [its] bankruptcy estate."  *Id.* at 498.  And the only thing that would risk "[p]arallel proceedings" would be keeping Katerra's sole "core"-styled claim in this Court.  *Id.* at 499.  Compelling arbitration would further, not impair, the goals of the Bankruptcy Code.

## 2.  Katerra's "Rejection" Of Certain Executory Contracts Does Not Eliminate D&T's Right To Arbitrate Katerra's Claims

36. Katerra has asserted a single ground for disregarding all of the above.  It argues that, because its third amended bankruptcy plan "rejected" certain executory contracts under 11 U.S.C. § 365(a), Katerra "is no longer bound by the arbitration clauses contained" in the engagement

letters.  *See* Compl. ¶ 6 n.5 (citing *In re Highland*, 2021 WL 5769320, at *6).  Katerra is wrong.
As an initial matter, Katerra just assumes the engagement letters were rejected, but that assumption
is faulty.  This Court, however, need not conclusively resolve that issue because even if Katerra
had rejected the letters, rejection would not eliminate D&T's right, or Katerra's corresponding
duty, to arbitrate.

<strong>a.      Katerra Did Not Reject The Engagement Letters</strong>

37. Katerra's argument begins with a dubious premise: that "the Deloitte engagement
letters were rejected by the plain language of the Plan."  *Id.* ¶ 6 n.5.  But Katerra's confirmed plan
does not mention the engagement letters.  It provides that each "Executory Contract . . . not
previously rejected, assumed, or assumed and assigned . . . shall be deemed automatically rejected
pursuant to section[] 365."  Third Amended Plan at 23.  And, as Katerra notes, a "Schedule of
Assumed Executory Contracts and Unexpired Leases" filed around the same time did not assume
the engagement letters.  *See* Compl. ¶ 6 n.5; ECF No. 1358, Ex. A.  So the question is whether the
engagement letters are "Executory Contract[s]" capable of being rejected.  They are not.

38. Section 365 permits a trustee, subject to court approval, to "assume or reject any
executory contract . . . of the debtor."  11 U.S.C. § 365(a).  The Fifth Circuit has held that "a
contract is executory if performance remains due to some extent on both sides and if at the time of
the bankruptcy filing, the failure of either party to complete performance would constitute a
material breach of the contract, thereby excusing the performance of the other party."  *In re Falcon
V, LLC*, 44 F.4th 348, 352, 355–56 (5th Cir. 2022) (citation omitted) (holding that a contract was
not executory under Section 365(a) because one side's obligations under it were "irrevocable,"
and so could not be excused by the counterparty's nonperformance).

39. The relevant engagement letters, at their core, required D&T to provide professional
services and Katerra to pay for those services. *See, e.g.*, Compl. ¶¶ 1, 3.  D&T provided those

17

services—indeed, Katerra alleges that D&T completed its last relevant audit in May 2020, more

than a year before Katerra filed for bankruptcy—and Katerra paid D&T for those services.  *See id.*

¶¶ 1 & n.1, 194, 197, 271, 296–300, 578.  Under binding Fifth Circuit law, the engagement letters

were not "executory."  *See In re Falcon V*, 44 F.4th at 352, 355–56.  That remains true even though

the obligations to arbitrate remain; those obligations are procedural in nature, providing only how

and where disputes pertaining to the parties' performance under the engagement letters must be

resolved.  *See Drake Bakeries, Inc. v. Loc. 50, Am. Bakery & Confectionary Workers Int'l, AFL-*

*CIO*, 370 U.S. 254, 262 (1962) ("repudiation of [an] arbitration clause by" one party generally is

not material enough for the other side to be "excused from arbitrating" its claims).[6]  The survival

of those obligations cannot make the engagement letters "executory."

### b.   Even If Rejected, D&T Still Has A Right To Arbitrate And Katerra Remains Bound To Do The Same

40. Even if the engagement letters were rejected by Katerra's bankruptcy plan (or if the

Court simply assumes as much), D&T still has a right to arbitrate and Katerra remains bound by

its agreement to do so.  That result is dictated by both bankruptcy law and the FAA.

41. Starting with bankruptcy law, Section 365 allows a debtor or trustee "to decide whether

[an executory] contract is a good deal for the estate going forward."  *Mission Prod. Holdings, Inc.*

*v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019).  If it is not, the trustee may "repudiat[e] further

performance of [the debtor's] duties" under that contract.  *Id.*  But under Section 365(g), rejection

is merely "a breach of such contract" as of the date before the bankruptcy petition was filed.  As

---

[6]  D&T is aware of just two cases case—neither binding on this court—to have suggested otherwise.  These cases were wrongly decided for many reasons discussed below.  As to this particular issue, the courts either did not engage with the question because the parties "agree[d]" that the contract was executory, *In re Highland*, 2021 WL 5769320, at *3 (Bankr. S.D. Tex. Dec. 3, 2021), or failed to consider the materiality inquiry required by *In re Falcon V*, *see Janvey v. Alguire*, 2014 WL 12654910, at *7–*11 (N.D. Tex. July 30, 2014).

the Supreme Court recently made clear in *Mission Product Holdings, Inc. v. Tempnology, LLC*,
"[a] rejection breaches a contract but does not rescind it." *Id.* at 1657–58. In concluding that a
trademark licensee could continue to exercise its rights under a rejected trademark license, the
Court held that "Section 365's text and fundamental principles of bankruptcy command" that a
rejection "has the same consequence as a contract breach outside bankruptcy." *Id.* at 1661. The
contract survives, "leaving intact the rights the counterparty has received under the contract." *Id.*
"And that means all the rights that would ordinarily survive a contract breach . . . remain in place."
*Id.* at 1658.

42. An arbitration provision, of course, usually survives a breach. *See, e.g.*, *Drake
Bakeries*, 370 U.S. at 262 ("Arbitration provisions, which themselves have not been repudiated,
are meant to survive breaches of contract, in many contexts, even total breach." (collecting cases)).
Any other rule would allow a party to shirk its promise to arbitrate simply by breaching other
contractual duties. And here the parties specifically bargained for arbitration rights that would
survive not only breach, but also "the completion or termination of th[e] engagement[s]." Compl.,
Exs. B–D, App'x E § 2; *see Mun. Energy Agency of Miss. v. Big Rivers Elec. Corp.*, 804 F.2d 338,
343 (5th Cir. 1986) (compelling arbitration based on survival clause). D&T's right to arbitrate
accordingly survives any rejection or breach of the parties' agreements.

43. The FAA reinforces that conclusion. Section 2 provides that arbitration agreements are
"enforceable" save "upon such grounds as exist at law or in equity for the *revocation* of any
contract." 9 U.S.C. § 2 (emphasis added). So *revocation* may render an arbitration provision
unenforceable—but not breach. *See HCB Enters., LLC v. Dickey's Barbecue Restaurants, Inc.*,
2020 WL 3643430, at *2 (D. Nev. July 6, 2020). Because rejection "cannot revoke" an existing

contract, *Tempnology*, 139 S. Ct. at 1666, a rejected arbitration provision "shall" remain "enforceable."

44. Courts across the country routinely apply these principles to conclude that rights to compel arbitration (and corresponding duties to arbitrate) survive the rejection of an agreement containing an arbitration provision. That has been the law in the Second Circuit for decades. *See Truck Drivers Local Union No. 807 v. Bohack Corp.*, 541 F.2d 312, 321 n.15 (2d Cir. 1976) ("If the contract is rejected . . . , it does not destroy the contract so as to absolve the parties (particularly the breaching party) from a contractual duty to arbitrate their disputes."). A district court in this District reached the same conclusion: Judge Atlas granted a motion for reconsideration, holding that her prior ruling—that a Section 365 rejection "terminated the contract"—was "error," and that the contract at issue "continue[d] to exist as an agreement between [the parties] to arbitrate their dispute in Houston." *Encompass Power Servs., Inc. v. Eng'g & Constr. Co.*, 2005 WL 3019740, at *2 (S.D. Tex. Nov. 10, 2005). And a district court in Nevada recently held likewise, explaining that "[t]he plain language of 11 U.S.C. § 365 allows a trustee to reject—not revoke—a contract"; this "rejection constitutes a breach of the agreement"; and "[a]s a result, . . . the bankruptcy code does not render arbitration clauses in rejected executory contracts inoperative." *HCB Enters.*, 2020 WL 3643430, at *2.

45. Numerous other district courts and bankruptcy courts are in accord. *See, e.g.*, *In re Paragon Offshore PLC*, 588 B.R. 735, 749 (Bankr. D. Del. 2018) (arbitration clause survived rejection and "the Court cannot now erase the contractual obligations the parties have agreed to under the Agreements" to arbitrate); *In re Fleming Cos.*, 325 B.R. 687, 693–94 (Bankr. D. Del. 2005) (enforcing arbitration provision despite rejection of contract); *Se. Pa. Transp. Auth. v. AWS Remediation, Inc.*, 2003 WL 21994811, at *3 (E.D. Pa. Aug. 18, 2003) (argument that rejection of

arbitration agreement eliminates right to arbitrate "fails for obvious reasons," including that "[w]hile a debtor may reject a contract in its 'entirety,' it may not invalidate freely negotiated methods of dispute resolution as they apply to pre-petition acts"); *Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp.*, 80 B.R. 606, 609 (D. Mass. 1987) (An "arbitration provision survives . . . rejection and retains its vitality as a viable method of alternative dispute resolution."); *cf. In re Monge Oil Corp.*, 83 B.R. 305, 308 (Bankr. E.D. Pa. 1988) ("[I]t may not follow from § 365(g)(1) that rejection of a contract voids a compulsory arbitration clause.").

46. Against that weight of authority, Katerra invokes a single bankruptcy court decision: *In re Highland*, 2021 WL 5769320, at *6. This Court should not follow *Highland*.

47. *Highland* involved a subset of non-core claims asserted by a debtor, where some (but not all) of the defendants moved to compel arbitration. *See id.* at *1–*2. The court acknowledged that the FAA and governing case law generally require arbitration of non-core claims asserted in bankruptcy. *See id.* at *4–*5. But it decided that the debtor's rejection of the arbitration agreement prevented the court from enforcing compliance with it. *Id.* at *7. In so holding, *Highland* ignored the near-consensus authority summarized above, relying instead on one district court decision (which was affirmed on *other grounds*) that it deemed "possibly binding[] on this court": *Janvey v. Alguire*, 2014 WL 12654910, at *7–*11 (N.D. Tex. July 30, 2014), *aff'd on other grounds*, 847 F.3d 231 (5th Cir. 2017).

48. *Janvey*, in turn, involved a receivership imposed by the SEC in the wake of a "massive Ponzi scheme," not a bankruptcy. 2014 WL 12654910, at *1. The court recognized that rejection cannot revoke or avoid a pre-petition contract, and can only result in a breach. *Id.* at *9. But it held this did not matter because, once rejected, parties injured by such a breach "cannot insist on specific performance." *Id.* (quoting Jay Lawrence Westbrook, *The Coming Encounter:*

*International Arbitration and Bankruptcy*, 67 Minn. L. Rev. 595, 619 (1983)).[7]  Thus, even if a debtor remained bound to arbitrate, the court believed that it lacked authority to compel compliance with that obligation.  *See id.*; *see also In re Highland*, 2021 WL 5769320, at *7.

49. *Janvey*'s reasoning cannot be squared with the Supreme Court's later decision in *Tempnology* or the FAA.  *First*, *Tempnology* makes clear that rejection "cannot rescind rights that the contract previously granted," and that "*all the rights* that would ordinarily survive a contract breach . . . remain in place" after rejection. 139 S. Ct. at 1658, 1666 (emphasis added).  But *Janvey* eliminates a party's right to compel arbitration, which would ordinarily survive breach.  *See, e.g.*, *Drake Bakeries*, 370 U.S. at 262.  The FAA forbids singling out the right to arbitrate as the lone disfavored right that is rescinded upon rejection.

50. *Second*, *Tempnology* makes clear that "a rejection has the same consequence as a contract breach outside bankruptcy."  139 S. Ct. at 1661.  The FAA, in turn, specifies that "the consequence" of breaching an arbitration agreement outside bankruptcy *is* an order compelling the breaching party to arbitrate.  *See* 9 U.S.C. § 4 (requiring that courts "*shall* make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement" (emphasis added)).[8]  So the FAA requires an order compelling arbitration even if the refusing party has

---

[7]  Both *Janvey* and *Highland* rely heavily on Professor Westbrook's article for this point and others.  *See In re Highland*, 2021 WL 5769320, at *6–*7; *Janvey*, 2014 WL 12654910, at *9.  But as for specific performance, none of the cases it discusses address the interplay between the FAA's express requirement of an order compelling arbitration and this broad background principle.  *See* Westbrook, *supra*, at 619 & n.94.  And more telling, even Professor Westbrook acknowledges that courts routinely enforce arbitration agreements notwithstanding rejection, *see id.* at 620–22, and that the few courts to have refused to enforce such agreements reached that result on grounds other than those discussed in his article (and adopted by *Highland* and *Janvey*), *see id.* at 622–23 (noting that "none of these courts analyzed these cases" in this way).

[8]  In discussing the usual consequences that flow from a breach "outside bankruptcy," the Court referred to a "claim for damages." *Tempnology*, 139 S. Ct. at 1661.  But it did not suggest that this shorthand for normal contractual remedies was meant to exhaustively catalogue the forms of relief available after rejection.

rejected the contract at issue.  No other rule would ensure that "a rejection has the same consequence as a contract breach outside bankruptcy."  *Tempnology*, 139 S. Ct. at 1661.

51. *Third*, limiting parties to a suit for money damages for breaches of arbitration provisions runs directly counter to one of the FAA's central purposes.  "The core of the Federal Arbitration Act . . . requires courts to enforce arbitration agreements with specific performance because money damages had proven an ineffective remedy for breach of the promise to arbitrate." Stephen J. Ware, *Arbitration Agreements as Executory Contracts in Bankruptcy After* Mission Prod. Holdings, Inc v. Tempnology, LLC, 96 Am. Bankr. L.J. 769, 787 (2022).  Until the FAA, the costs of a breached arbitration agreement were "virtually impossible to quantify, so courts did not even try"—instead often awarding "nominal damages of one dollar or so."  *Id.* at 788 (citation omitted).  Because monetary remedies were essentially "illusory," parties could breach their arbitration commitments with impunity.  *Id.* (citation omitted); *see* S. Rep. No. 68-536, at 2 (1924) (lamenting that this relief too often left parties seeking "to carry out the arbitration agreement . . . without adequate remedy").  Section 4 of the FAA responded directly to these concerns: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may seek "an order directing that such arbitration proceed" as agreed. 9 U.S.C. § 4.  And courts now "shall make an order" compelling arbitration if the contract so requires.  *Id.  Janvey* impermissibly undoes that command.

52. *Fourth*, even setting aside the FAA's clear mandate, declining to compel arbitration would not further Section 365(a)'s purposes.  Usually, rejection allows the debtor to avoid costly contractual obligations.  *See Tempnology*, 139 S. Ct. at 1658.  Ordering specific performance of the same costly obligation the debtor is trying to avoid would of course defeat the entire purpose of rejection.  But *Janvey* takes this basic insight and applies it out of context.  Even if an arbitration

agreement is executory, there is no comparable concern about ordering specific performance.  And certainly not in this case: no one is seeking to burden Katerra with extensive obligations, or to take more than its fair share from Katerra's estate.  *Katerra* is the suing party, and is seeking to recover *from D&T*.  Katerra has already decided to litigate these claims, and it will bear the costs of doing so regardless of the forum.  D&T is not asking the Court to saddle Katerra with some onerous obligation it does not want to perform; it is simply asking the Court to enforce the parties' agreement as to the forum in which Katerra's already-asserted claims may proceed.  Ordering specific performance in this context is fully consistent with the purposes of the Bankruptcy Code.

53. *Finally*, *Highland* adds nothing to *Janvey*'s flawed reasoning.  *See* 2021 WL 5769320, at *7 ("The court defers to the compelling reasoning of . . . *Janvey* on this point.").  Despite coming two years after *Tempnology*, and despite the parties having brought that case to the court's attention, *Highland* does not mention it.  *Id.* at *5–*7.[9]  And *Highland* failed to grapple with the extensive authority routinely compelling arbitration in similar circumstances.  The court simply cherry-picked one of the many cases cited above, and dismissed that case because (1) it found *Janvey* "to be more persuasive," (2) it believed *Janvey* was "potentially binding[] on this court," and (3) in that case, "it was the debtor . . . , not the executory contract's counterparty, who was invoking the arbitration clause" at issue.  *Id.* at *7 (citing *In re Fleming*, 325 B.R. 687).  The first point is wrong, for the reasons already discussed.  The second is irrelevant, as *Janvey* does not even arguably bind this Court.  The third also fails: as *Fleming* acknowledged, many other cases

---

[9]  Counsel brought *Tempnology* to the *Highland* court's attention during oral argument in that case: "I am advised to remind Your Honor of the *Mission Products* [*v. Tempnology*] case. . . .  [T]he Supreme Court has [] recognized that rejection of an executory contract is not tantamount to avoiding the contract and it doesn't take away the nondebtor's rights under it, particularly like arbitration."  *See In re Highland*, No. 21-03003-sgj, ECF No. 116 at 27 (Bankr. N.D. Tex. Nov. 16, 2021).

have compelled debtors, not just their counterparties, to arbitrate.  *See, e.g.*, *In re Paragon*, 588 B.R. at 741, 749; *In re Monge*, 83 B.R. at 308; *Distrigas*, 80 B.R. at 607, 609; *see also In re Fleming*, 325 B.R. at 694 (holding that identity of rejecting party was "immaterial" and that "[t]he survival of an arbitration clause should be the same for either party").  And there is no reason in law or logic to allow debtors unilaterally to choose whether to abide by their prior agreements to arbitrate.

54. The Court should follow the many decisions enforcing rejected arbitration provisions and decline to adopt the ill-conceived "outlier" reasoning in *Highland* and *Janvey*.  *See* Ware, *supra*, at 771–72, 795–96, 816–17 (explaining why the other "many cases are right," and "the two outlier," "erroneous" decisions in *Highland* and *Janvey* are wrong).

## IV.   THE COURT SHOULD DISMISS THIS ADVERSARY PROCEEDING OR, IN THE ALTERNATIVE, STAY IT PENDING ARBITRATION

55. If the Court compels arbitration of all Katerra's claims, it should dismiss this entire adversary proceeding.  *See, e.g.*, *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in . . . court must be submitted to arbitration," and the district court therefore "acted within its discretion when it dismissed this case with prejudice."); *see also Griggs v. S.G.E. Mgmt., LLC*, 905 F.3d 835, 839 (5th Cir. 2018) ("[T]his circuit allows district courts to dismiss . . . claims [subject to arbitration clauses] outright.").  Given that all Katerra's claims will be resolved in the parties' chosen arbitral forum, there is nothing to gain from this Court retaining jurisdiction over this improperly launched adversary proceeding.

56. In the alternative, or if the Court compels arbitration of less than all of Katerra's claims, the Court should stay this case pending completion of the arbitration.  *See* 9 U.S.C. § 3 (requiring stay of proceedings whenever "any issue" is "referable to arbitration"); *see Gilmer v.*

*Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Alford*, 975 F.2d at 1164 (recognizing that, absent dismissal, "a stay is mandatory upon a showing that the opposing party has commenced suit upon *any* issue referable to arbitration" (citation omitted)).

## V.    CONCLUSION

57. For all these reasons, D&T requests that the Court (1) compel Katerra to arbitrate its claims in accordance with the engagement letters' arbitration provisions, (2) (a) dismiss this action pending the outcome of any arbitration or, alternatively (b) stay it pending arbitration, and (3) grant such other and further relief as is just and proper.

Dated: March 3, 2023

Jamie L. Wine (*pro hac vice*)
Adam B. Shamah (*pro hac vice*)
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-2904
Email:  jamie.wine@lw.com

Melissa Arbus Sherry (*pro hac vice pending*)
Jordan R. Goldberg (*pro hac vice pending*)
Latham & Watkins LLP
555 Eleventh Street, NW
Washington, DC 20004
Telephone:  (202) 637-2200
Email:  melissa.sherry@lw.com

By:   */s/ John F. Higgins*
John F. Higgins, Esq.
(Tex. Bar No. 09597500)
Porter Hedges LLP
1000 Main Steet, 36th Floor
Houston, TX 7702
Telephone:  (713) 226-6000
Facsimile:  (713) 226-6248
Email:  jhiggins@porterhedges.com

*Counsel for Deloitte & Touche LLP*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 3, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *John F. Higgins*
John F. Higgins