## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| KATERRA INC., *et al.*, | : |
| | : Case No. 21-31861 (DRJ) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| KATERRA INC., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors | : |
| | : |
| | : |
| | : Adv. No. 22-03344 |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| Deloitte & Touche LLP | : |
| | : |
| | : |
| Defendant. | : |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS OR, IN THE ALTERNATIVE, STAY THE ADVERSARY PROCEEDING

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

A.    Scope of Deloitte's Engagement.............................................................................. 3

B.    The Engagement Letters with Deloitte .................................................................. 4

C.    GAAS Added To Deloitte's Obligations Under the Engagement Letters .......................... 7

D.    Deloitte's Continuing Work Relating to the Katerra Audits .................................. 8

      I.     Deloitte's Services During the Renovations Investigation .................................. 10

      II.    Deloitte's Services During the Katerra West Investigation .................................. 11

      III.   Deloitte Engaged to Perform the 2020 Audit ....................................................... 12

E.    Katerra's Bankruptcy Petition and Plan............................................................... 13

LEGAL ARGUMENT........................................................................................................ 15

A.    The Bankruptcy Court May Decide Questions of Arbitrability........................................ 16

B.    Deloitte Has Not Met its Burden to Demonstrate that the Parties Agreed to Arbitrate
.................................................................................................................................. 19

C.    The Parties Did Not Agree To Arbitrate This Dispute and No Valid Arbitration
Agreement Exists ................................................................................................... 20

      I.     The Engagement Letters Are Executory Contracts That Were Rejected by
the Plan................................................................................................................... 20

      II.    Executory Contracts: Unperformed Material Obligations On Both Sides as
of the Petition Date ............................................................................................... 21

      III.   This Court is Not Required To Compel Arbitration Under *Mission Product* ...... 26

      IV.   The Arbitration Provision in the Engagement Letters is Illusory and
Therefore Not Enforceable .................................................................................... 31

D.    The Objectives of the Bankruptcy Code Prevent Enforcement of the Arbitration
Provision ................................................................................................................ 33

      I.     Prong 1: The Complaint Involves a Core Claim.................................................... 34

II.    Prong 2: Enforcement of the Arbitration Provision Conflicts with the
Objectives of the Bankruptcy Code ................................................................... 36

E.    In the Alternative, the Court Should Deny the Motion to Compel as to the
Fraudulent Transfer Claim and Stay Arbitration Pending Resolution of the
Fraudulent Transfer Claim ................................................................................. 39

CONCLUSION .......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 24R, Inc.*,
    324 S.W.3d 564 (Tex. 2010) ...........................................................................................32, 33

*Am. Heritage Life Ins. Co. v. Orr*,
    294 F.3d 702 (5th Cir. 2002) ................................................................................................40

*Archer and White Sales, Incorporated v. Henry Schein, Incorporated*,
    935 F.3d 274 (5th Cir. 2019) ................................................................................................17

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986) ..............................................................................................................16

*Banc One Acceptance Corp. v. Hill*,
    367 F.3d 426 (5th Cir. 2004) ................................................................................................19

*In re Bethlehem Steel Corp.*,
    390 B.R. 784 (Bankr. S.D.N.Y. 2008) ................................................................................36

*In re Caldor, Inc.*,
    217 B.R. 121 (Bankr. S.D.N.Y. 1998) ...........................................................................36, 38

*Carey v. 24 Hour Fitness, USA, Inc.*,
    669 F.3d 202 (5th Cir. 2012) ................................................................................................33

*CKB Assocs., Inc. v. Moore McCormack Petroleum Inc.*,
    734 S.W.2d 653 (Tex. 1987) .................................................................................................31

*ConocoPhillips Co. v. Noble Energy, Inc.*,
    462 S.W.3d 255 (Tex. App. 2015) ..................................................................................22, 23

*Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*,
    671 F.3d 1011 (9th Cir. 2012) ..............................................................................................37

*Daisy Mfg. Co. v. NCR Corp.*,
    29 F.3d 389 (8th Cir. 1994) ..................................................................................................20

*Desantis v. Wackenhut Corp.*,
    793 S.W.2d 670 (Tex. 1990) .................................................................................................32

*In re Energy Conversion Devices, Inc.*,
    621 B.R. 674 (Bankr. E.D. Mich. 2020) ..............................................................................23

iii

*In re Falcon V, L.L.C.*,
    44 F.4th 348 (5th Cir. 2022) ...................................................................21, 22, 24

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)..............................................................................................16, 17

*Fleetwood Enters., Inc. v. Gaskamp*,
    280 F.3d 1069 (5th Cir. 2002) ............................................................................19, 33

*In re FRG*,
    115 B.R. 72 (Bankr. E.D.Pa. 1990) ...........................................................................38

*In re Gandy*,
    299 F.3d 489 (5th Cir. 2002) .......................................................................35, 36, 38, 40

*Giddings Petroleum Corp. v. Peterson Food Mart, Inc.*,
    859 S.W.2d 89 (Tex. App. 1993)................................................................................23

*Gross v. GGNSC Southaven*,
    L.L.C., 817 F.3d 169 (5th Cir. 2016) ........................................................................20

*In re Guevara*,
    409 B.R. 442 (Bankr. S.D. Tex. 2009) ......................................................................32

*Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville
    Forest Products Corp.)*,
    896 F.2d 1384 (2d Cir. 1990)....................................................................................36

*In re Halliburton Co.*,
    80 S.W.3d 566 (Tex. 2002).......................................................................................33

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
    139 S.Ct. 524 (2019)...............................................................................................16, 17

*Matter of Henry*,
    944 F.3d 587 (5th Cir. 2019) ...................................................................................30, 36

*In re Highland Cap. Mgmt., L.P.*,
    2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021) ..................................... *passim*

*In re Huffman*,
    486 B.R. 343 (Bankr. S.D. Miss. 2013)...................................................34, 35, 37

*Innovative Clinical Solutions, Ltd. v. Clinical Research Center P.C.*,
    173 F.Supp.2d 826 (C.D. Ill. 2001) .........................................................................23

*J.M. Davidson, Inc. v. Webster*,
    128 S.W.3d 223 (Tex. 2003).....................................................................................32

*Janvey v. Alguire*,
2014 WL 12654910 (N.D. Tex. Jul. 30, 2014), *affirmed by* 847 F.3d 231 (5th
Cir. 2017) ................................................................................................................... *passim*

*In re Kemeta, LLC*,
470 B.R. 304 (Bankr. D. Del. 2012) ...................................................................................23

*Kittay v. Landegger (In re Hagerstown Fiber Ltd. Pship*),
277 B.R. 181 (Bankr. S.D.N.Y. 2002) ...............................................................................35

*In re Laubenstein*,
2021 WL 857142 (M.D. Fl. Mar. 7, 2021) .........................................................................34

*Lizalde v. Vista Quality Markets*,
746 F.3d 222 (5th Cir. 2014) ..............................................................................................33

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond
Metal Finishers, Inc.*),
756 F.2d 1043 (4th Cir. 1985) ............................................................................................23

*Martin v. Medtronic, Inc.*,
254 F.3d 573 (5th Cir. 2001) ..............................................................................................30

*Maxus Exploration Co. v. Moran Bros., Inc.*,
817 W.S.2d 50,53 (Tex. 1991)............................................................................................32

*In re McCollum*,
2021 WL 4888327 (Bankr. N.D. Miss. Oct. 19, 2021)......................................................35

*Mendivil v. Zanios Foods, Inc.*,
357 S.W.3d 827 (Tex.App.-El Paso 2012) .........................................................................32

*In re Mirant Corp.*,
316 B.R. 234 (Bankr. N.D. Tex. 2004)..........................................................................38, 39

*Mission Product Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) ....................................................26, 28, 29, 30

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)................................................19, 33

*Morrison v. Amway Corp.*,
517 F.3d 248 (5th Cir. 2008) ..............................................................................................32

*Moses v. CashCall, Inc.*,
781 F.3d 63 (4th Cir. 2015) ...........................................................................................37, 38

*In re National Gypsum*,
  118 F.3d 1056 (5th Cir. 1997) ...................................................................34, 37

*PaineWebber Inc. v. Hartmann*,
  921 F.2d 507 (3d Cir. 1990)......................................................................20

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
  687 F.3d 671 (5th Cir. 2012) ...............................................................17, 18

*Phillips v. Congelton, LLC (In re White Mountain Mining Co.)*,
  403 F.3d 164 (4th Cir. 2005) ....................................................................38

*Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*,
  15 F.3d 60 (5th Cir. 1994) ........................................................................21

*Matter of Provider Meds*,
  L.L.C., 907 F.3d 845 (5th Cir. 2018)....................................................21, 23

*In re Relativity Fashion, LLC*,
  696 F. App'x 26 (2d Cir. 2017) ................................................................36

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010)....................................................................................16

*In re S.W. Bach & Co.*,
  425 B.R. 78 (Bankr. S.D.N.Y. 2010) .......................................................39

*In re Safety–Kleen Corp.*,
  410 B.R. 164 (Bankr. D. Del. 2009) .........................................................22

*Taylor v. Community Bankers Securities, LLC*,
  2012 WL 6630542 (S.D. Tex. Dec. 19, 2012).........................................19

*Tittle v. Enron Corp.*,
  463 F.3d 410 (5th Cir. 2006) ....................................................................20

*Torres v. S.G.E. Mgmt., L.L.C.*,
  397 F. App'x 63 (5th Cir. 2010) ...............................................................32

*In re Try the World*,
  2021 WL 3502607 (Bankr. S.D.N.Y. Aug. 6, 2021) ....................35, 36, 40

*United States v. Zuniga-Salinas*,
  945 F.2d 1302 (5th Cir. 1991) ..................................................................30

*Wagner v. Apache Corp.*,
  627 S.W.3d 277 (Tex. 2021)......................................................................32

*Webb v. Investacorp Inc.*,
  89 F.3d 252 (5th Cir. 1996) ...........................................................................20

**Statutes**

11 U.S.C. § 11 .................................................................................................13

11 U.S.C. § 323 ...............................................................................................34

11 U.S.C. § 365 ........................................................................................*passim*

11 U.S.C. § 544(b) .....................................................................................4, 34

11 U.S.C. § 548 ..........................................................................................4, 34

11 U.S.C. § 550 ..........................................................................................4, 34

11 U.S.C. § 551 ..........................................................................................4, 34

11 U.S.C. § 704 ...............................................................................................34

11 U.S.C. § 1123 .............................................................................................14

28 U.S.C. § 157(b)(1) ......................................................................................34

28 U.S.C. § 158 ...............................................................................................34

**Other Authorities**

Fed. R. Bankr. P. 1009 ....................................................................................14

Fed. R. Bankr. P. 6009 ....................................................................................34

CPR Rules for Non-Administered Arbitration, Rule 8 ..............................18, 19

American Arbitration Association Construction Industry Arbitration Rules, Rule 9 ..................18

Jay Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 Univ. of Minn. Law School 595, 623 (1983)) ................................27, 28

Katerra Inc. and its related debtors ("Plaintiff," "Katerra" or the "Company"),[1] by and through, Daniel R. Williams, as Plan Administrator, ("Plan Administrator"), by and through his counsel, Fox Rothschild LLP, hereby files this memorandum of law in opposition to the Motion to Compel Arbitration (the "Motion to Compel") filed by defendant Deloitte & Touche LLP ("Defendant" or "Deloitte") and in support thereof respectfully states as follows:

## INTRODUCTION

1.      Plaintiff has asserted claims against Deloitte, the independent auditor of the Katerra Debtors, arising out of Deloitte's failure to completely perform the auditing services it contracted to do, despite receiving over ▮▮▮▮▮ in fees from the Company.  These fees form the basis for Plaintiff's fraudulent transfer claims under Chapter 5 of the Bankruptcy Code, as asserted in the Complaint.

2.      Plaintiff also seeks damages resulting from Deloitte's failure to conduct its audits of Katerra's financial statements and provide audit opinions in compliance with generally accepted auditing standards ("GAAS")[2] which contributed to Katerra's eventual bankruptcy, as set forth in the Complaint.

3.      Deloitte seeks to compel the arbitration of Plaintiff's claims based upon an arbitration provision contained in engagement letters, which are no longer binding.  The Engagement Letters were executory contracts rejected by the confirmed plan in the Katerra Debtors' chapter 11 cases, approved by this Court in October 2021.

4.      Deloitte's assertion that the engagement letters were fully performed as of Katerra's

---

[1] Katerra, Inc. sought Chapter 11 bankruptcy protection on June 6, 2021 in this Court (Case No. 21-31861(DRJ)). On October 21, 2021, the Court issued an order appointing the Plan Administrator of Katerra. A complete list of each of the debtors (the "Katerra Debtors") may be obtained at https://cases.ra.kroll.com/Katerra/Home-Index.

[2] In the United States, auditing standards for private companies is codified in the American Institute of Certified Public Accountants ("AICPA") Professional Standards."

petition date is wrong.  In fact, the engagement letters contained material obligations on the part of both Katerra and Deloitte that were unperformed or not yet triggered at the time of Katerra's petition date.  As such, the engagement letters were executory contracts expressly rejected by the plan, and Plaintiff cannot be required to specifically perform the obligations contained therein.

5.      For this reason alone, the Court may deny the Motion to Compel.  However, the Court has additional grounds upon which to deny the Motion to Compel.

6.      The arbitration provisions in the engagement letters are unenforceable because they are illusory contracts, containing one-sided obligations that would solely bind Katerra and not Deloitte.  Specifically, each of the engagement letters contains a survival clause, stating that "The agreements and undertakings of [Katerra] contained in the engagement letter will survive the … termination of this engagement."  The language of this provision clearly provides that the terms of the engagement letters—inclusive of the arbitration provision—bind the Company, not Deloitte, indefinitely.  Well-established principles of Texas common law deem such illusory contracts unenforceable.

7.      Finally, under well-established Fifth Circuit precedent, the Court may exercise its discretion to determine that the arbitration provisions are unenforceable because certain of the claims asserted by the Plaintiff are derived solely under the Bankruptcy Code and involve the rights not just of the Plan Administrator, but the creditors of Katerra's estates.  Given the magnitude of the Plaintiff's claims, the importance of this recovery to the estates' creditors, and this Court's knowledge and understanding of the Katerra Chapter 11 Cases, this Court can more efficiently decide the litigation, as compared to a costly arbitration.  Simply put, this Court is the appropriate forum to adjudicate this dispute.

## FACTUAL BACKGROUND

### A.    Scope of Deloitte's Engagement

8.      As set forth in further detail in the Complaint, prior to its bankruptcy filing in June 2021, Katerra was a construction company that developed, manufactured, and marketed products and services in the commercial and residential construction spaces in the United States, the Middle East and Asia.[3]

9.      Katerra engaged Deloitte to perform certain auditing services pursuant to engagement letters dated March 6, 2018, October 12, 2018, December 12, 2019, and December 30, 2020 for fiscal years ending 2017, 2018, 2019 and 2020  (each an "Engagement Letter" and together, the "Engagement Letters"). *See* Exhibits B-D to Complaint; Exhibit 5 to the Declaration of Adam Shamah ("Shamah Decl.").

10.     Pursuant to the Engagement Letters, Deloitte audited Katerra's financial statements for the years ending 2017, 2018, and 2019.

11.     In exchange for the auditing work it covenanted to perform under the Engagement Letters, Katerra made payments to Deloitte totaling ███████ .

12.     Deloitte also performed auditing work relating to the financial statements for the year ending 2020 ("2020 Audit") but did not complete the work due to Katerra's filing of a bankruptcy petition on June 6, 2021.

13.     Despite receiving such fees from Katerra, Deloitte utterly failed to fulfill its professional obligations under the terms of the Engagement Letters and in violation of the relevant professional standards.  Deloitte was required to ███████████████████ ████████████████████████████████████

---

[3] The allegations of the Complaint are incorporated fully herein.

3

███████████████████████████████████████

14.     Deloitte's failures fall into four main categories: (1) failure to issue a qualified or adverse opinion with respect to its going concern assessment of Katerra; (2) failure to properly disclose related party transactions between Katerra and various affiliated entities; (3) failure to capture the extent of Katerra's construction losses and to grasp the magnitude of Katerra's complete lack of controls and rampant improper revenue recognition processes; and (4) failure to adequately assess goodwill and intangible assets.

15.     In March 2022, Plaintiff sent Deloitte a letter notifying the auditor of the potential claims, expressly reserving "█████████████████████████████████████

████████████████████████████" Shamah Decl., Exhibit 6 at 1 & n.1.

16.     In September 2022, the parties participated in a single mediation session. Arbitration was never commenced.

17.     On December 31, 2022, the Plan Administrator filed the Complaint, asserting claims for the avoidance and recovery of constructive fraudulent transfers under 11 U.S.C. §§ 544(b), 548(b), 550, and 551 (Count I), Breach of Contract (Count II), Professional Negligence/Malpractice (Count III), Negligent Misrepresentation (Count IV), Aiding and Abetting Breach of Fiduciary Duty (Count V), and Unjust Enrichment (Count VI).

**B.     The Engagement Letters with Deloitte**

18.     The Engagement Letters, each of which is substantively identical, outline the scope of Deloitte's audits on behalf of Katerra.

19.     As described in the Engagement Letters, Deloitte's engagement is █████████████

███████████████████████████████████████████

with the objective of forming an █████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ Exhibits B-D to Complaint at page 173,

186, and 199; Shamah Decl., Exhibit 5 at 25-5, page 2.

20.     The Engagement Letters set forth the parties' respective obligations relating to ██

██████████████████████████████████

21.     The Engagement Letters contain specific provisions that set forth obligations of

both parties that must be performed 1) on a continuing basis or 2) if triggered at some point in the

future.  These include:

    i.     ████████████████████████████████████████
████████████████████ (Exhibits B-D to Complaint
at 180, 194, 206; Shamah Decl., Exhibit 5 at 25-5, page 9);

    ii.    ████████████████████████████████████████
████████████████████████████████████████
████████████████ (Exhibits B-D to Complaint at 180, 194, 206;
Shamah Decl., Exhibit 5 at 25-5, page 9);

    iii.   ████████████████████████████████████████
████ (Exhibits B-D to Complaint at 180, 194, 206; Shamah Decl., Exhibit 5 at
25-5, page 9);

    iv.    ████████████████████████████████████████
███████ (Exhibits B-D to Complaint at pages 180, 194,
206; Shamah Decl., Exhibit 5 at 25-5, page 9);

    v.     ████████████████████████████████████████
██████ (Exhibits B-D to Complaint at pages 173, 187, and 199-200;
Shamah Decl., Exhibit 5 at 25-5, page 2);

    vi.    ████████████████████████████████████████
████████████████████████████████████████
(Exhibits B-D to Complaint at pages 175, 188, 201; Shamah Decl., Exhibit 5 at
25-5, page 4);

vii. ███████████████████████████████████
████████████████████████████ (Exhibits B-D to Complaint at pages 179, 193-94, 205; Shamah Decl., Exhibit 5 at page 8);

viii. ███████████████████████████ (Exhibits B-D to Complaint at pages 175, 188-89, 201; Shamah Decl., Exhibit 5 at 25-5, page 4); and

ix. ████████████████████████████████ (Exhibits B-D to Complaint at pages 179, 194, 206; Shamah Decl., Exhibit 5 at page 8).

22.     Lastly, the Engagement Letters set forth the dispute resolution process between the parties (the "Arbitration Provision"):

> Any controversy or claim between the parties arising out of or relating to the engagement letter of this or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration…

> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. …

> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration…

*See* Exhibits B-D to Complaint at pages 183-84, 196-97, 208-09; Shamah Decl., Exhibit 5 at page 11-12.

23.     In addition, the Engagement Letters include a survival clause, which states that: "The agreements and undertakings of the Company contained in the engagement letter will survive" the "termination of this engagement."  Exhibits B-D to Complaint at pages 182, 196, 208; Shamah Decl., Exhibit 5 at page 11 (emphasis added).

24.     There is no corresponding provision binding Deloitte to its agreements and undertakings in the Engagement Letters after termination of the engagement.

**C.      GAAS Added To Deloitte's Obligations Under the Engagement Letters**

25.     Under the terms of the Engagement Letters, ███████████████████████████ ████████████████████████████████████████████ .

26.     GAAS devotes a section to an auditor's responsibilities relating to the discovery of subsequent events and subsequently discovered facts in an audit of financial statements.  *See* AU-C Section 560, ¶ .03, Exhibit 1, *Declaration of Elizabeth C. Viele, In Support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Arbitration and Dismiss or, in the Alternative, Stay the Adversary Proceeding* (the "Viele Declaration").

27.     GAAS includes provisions regarding an auditor's responsibilities with respect to 1) subsequent events occurring between the date of the financial statements and the date of the auditor's report that require adjustment of, or disclosure in, the financial statements and 2) subsequently discovered facts that become known to the auditor after the date of the auditor's report."  AU-C Section 560, ¶ .03, Exhibit 1, Viele Declaration.

28.     The section is replete with obligations on the part of the auditor in the event that the auditor learns of subsequent events and/or subsequently discovered facts that would affect its audit of financial statements.  A few examples are included below.

29.     AU-C Section 560 states that if an auditor becomes aware of a fact after a report's release date, the auditor should 1) "discuss the matter with management and, when appropriate, those charged with governance" and 2) "determine whether the financial statements need revision, and, if so, inquire how management intends to address the matter in the financial statements." *Id*. at ¶ .15

30.     In relevant part, AU-C Section 560 also states that:

> If management does not take the necessary steps to ensure that anyone in receipt of the audited financial statements is informed of the situation [relating to subsequent events and/or subsequently discovered facts], the auditor should notify management and those charged with governance—unless all of those charged with governance are involved in managing the entity—that the auditor will seek to prevent future reliance on the auditor's report. If, despite such notification, management or those charged with governance do not take the necessary steps, the auditor should take appropriate action to seek to prevent reliance on the auditor's report.

*Id*. at ¶ .18

31.     In addition, "when audited financial statements are included in other documents subsequent to their issuance, the auditor may have additional responsibilities to consider, such as legal or regulatory requirements involving private placement offerings, exempt public offerings (including offerings pursuant to Securities and Exchange Commission [SEC] Rule 144A), or other offerings of securities to the public in jurisdictions outside the United States…"   *Id*. at ¶ .A1.

32.     GAAS does not put an end date on an auditor's responsibilities.  To the contrary, AU-C Section 560 states that such responsibilities remain in place even if an auditor has withdrawn or been discharged: "New information may come to the auditor's attention that, had such information been known to the auditor at the date of the auditor's report, may have caused the auditor to revise the auditor's report. When such information becomes known to the auditor after the report release date, the requirements in paragraphs .15–.18 apply, *even if the auditor has withdrawn or been discharged*."  *Id*. at ¶ .A18 (emphasis added).

33.     A plain reading of GAAS shows that Deloitte's responsibilities with respect to subsequent events and subsequently discovered facts survive even after Deloitte's auditor report on Katerra's financial statements was issued.

### D.     Deloitte's Continuing Work Relating to the Katerra Audits

34.     Deloitte's contention that its work relating to Katerra ended with the "completed

audit" for the financial statements for the year ending December 31, 2019 (the "2019 Audit") is false. Motion to Compel, ¶ 6.

35.     Indeed, on May 14, 2020, Deloitte issued the 2019 Audit, notifying Katerra CEO Michael Marks ("Marks") by letter that it had ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████     *See* Letter to Marks dated May 14, 2020, Exhibit 2, Viele Declaration.[4]

36.     However, Deloitte's obligations did not end with the issuance of its audit opinion and the payment for the issuance of the opinion. For example, for many months after the issuance of Deloitte's 2019 Audit, Deloitte was actively involved in the Securities and Exchange Commission's ("SEC") investigations of Katerra's business units, Katerra West and Katerra Renovations (the "SEC Investigation"). *See* K&E Presentation to SEC dated August 20, 2020, Exhibit 3, Viele Declaration.

37.     As set forth in GAAS, Deloitte had continuing obligations to comply with the Engagement Letters. Thus, during the pendency of the SEC Investigation, Deloitte's obligations under the Engagement Letters— ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████—remained outstanding. *See* Exhibits B-D to Complaint at pages 173, 187, and 199-200; Shamah Decl., Exhibit 5 at 25-5, page 2.

38.     Deloitte's ongoing work relating to the 2019 Audit and SEC Investigation illustrate

---

[4] Deloitte sent Katerra CEO Michael Marks, CFO Matt Marsh ("Marsh") and VP/Controller Matt Tachouet ("Tachouet") the management representation letter to sign in connection with the 2019 Audit on May 15, 2020. Deloitte sent Katerra the final issued financial statements on May 15, 2020 after the management representation letter had been signed, however, Deloitte's letter was dated May 14, 2020. *See* K&E Presentation to SEC dated August 20, 2020, Exhibit 3, Viele Declaration.

that the Engagement Letters were executory contracts, which were subject to rejection (and subsequently rejected) under the Plan.

## I.     Deloitte's Services During the Renovations Investigation

39.     No later than May 26, 2020, Deloitte was informed of Katerra's internal investigation into misconduct discovered within the Katerra Renovations business unit by counsel for Katerra (the "Renovations Investigation").  *See* K&E Presentation to SEC dated August 20, 2020, Exhibit 3, Viele Declaration.  The Renovations Investigation, including the review of a substantial amount of data and documents and the completion of dozens of witness interviews, examined improper revenue recognition practices by Katerra Renovations employees in 2019 and 2020 that inflated Katerra's revenue.

40.     Following the initial briefing by Katerra, Deloitte met with counsel for Katerra on at least three separate occasions.  *See id*.

41.     On June 26, 2020, ███████████, a partner at Deloitte, sent an email to Marks, Marsh, and Tachouet with "███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████" *See* Email to Marks, Marsh and Tachouet dated June 26, 2020, Exhibit 4, Viele Declaration.

42.     On August 7, 2020, Katerra's counsel self-reported the Renovations Investigation to the SEC, commencing the SEC Investigation. *See* K&E Presentation to SEC dated August 20, Exhibit 3, Viele Declaration.

43.     On August 11, 2020, Katerra's counsel reported the findings of the Renovations Investigation to Deloitte. *See id.*

44.     In the presentation to the SEC dated August 20, 2020, ███████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████. *See id*.

45.    On September 14, 2020, ████████████ emailed Mollie Fadule, a Katerra employee, explaining that Deloitte's review of the first investigation is with their risk management team, and explained that Deloitte is also working on the "████████████████████████████████ ████████████████████████████████████." *See* Email from ████████ ████ to Mollie Fadule dated September 14, 2020, Exhibit 5, Viele Declaration.

## II.    Deloitte's Services During the Katerra West Investigation

46.    In August 2020, counsel for Katerra commenced a second investigation into a different Katerra business unit, Katerra West, at Deloitte's request, relating to alleged mis-recording of losses between projects and business units, and improper use of contingencies to misstate Katerra West's financial results (the "Katerra West Investigation").

47.    As set forth in Katerra's presentation to the SEC, "██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████." *See* K&E Presentation to SEC dated December 4, 2020, Exhibit 6, Viele Declaration.

48.    Deloitte assisted Katerra's counsel in the Katerra West Investigation, identifying key witnesses at the company for email searches. *See id*.

49.    As set forth below, Deloitte also conducted internal investigation work relating to the Katerra misstatements.

50.    On September 30, 2020, Katerra released an "Accounting Topic Discussion Paper" which discusses whether the Q2 Estimated Cost at Completion ("ECAC") constitutes a ████████ ████████████████████████████████████████████████████ ████████████████████████ *See* Accounting Topic Discussion

Paper dated September 30, 2020, Exhibit 7, Viele Declaration.

51.     Deloitte scheduled a kick off meeting on October 13, 2020 with Tachouet to

"████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████." *See* Email from ████████████ to Krishna Shivram dated

October 9, 2020, Exhibit 8, Viele Declaration.

52.     Shortly thereafter, Deloitte and Katerra exchanged multiple emails to discuss the

investigation and Deloitte requested documentation ████████████████████████████

in Katerra's memorandum.  *See* Emails between ████████████ and Matt Tachouet spanning

from October 14 to 16, 2020, Exhibit 9, Viele Declaration.

53.     On November 12, 2020, Katerra's counsel reported the findings of the Katerra West

Investigation to Deloitte. *See id.*

54.     Deloitte also produced documents relating to the Renovations and Katerra West

Investigations.

55.     Further, on December 21, 2020, in a document entitled "FY 20 Hours and Fee

Proposal" (the "<u>Fee Proposal</u>"), Deloitte ████████████████████████████████

████████████████████████████████. *See* Fee Proposal, Exhibit 10, Viele

Declaration.

56.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

### III.     Deloitte Engaged to Perform the 2020 Audit

57.     As set forth above, Deloitte and Katerra entered into an engagement letter dated

December 30, 2020 (the "<u>2020 Engagement Letter</u>"), pursuant to which Deloitte was to perform

the 2020 Audit.  *See* Shamah Decl., Exhibit 5.

58.    The 2020 Engagement Letter contained the same Arbitration Provision as the Engagement Letters from each of the prior years.  *See id*. at Appendix F.

59.    An audit of fiscal year 2020 would by necessity include a comparison with Katerra's 2019 financial statements.

60.    Deloitte performed work pursuant to the 2020 Engagement Letter, but as Deloitte stated in the Motion to Compel, that work was ongoing and not completed at the time Katerra filed its voluntary petition on June 6, 2021.  *See* Motion to Compel, ¶6.

61.    Deloitte sent invoices totaling $2,041,073 to Katerra for work related to the 2020 Audit on March 13, 2021, April 10, 2021, May 19, 2021 and June 6, 2021. *See* Plan Administrator Declaration, at ¶ 24.

62.    The Fee Proposal budgeted ████████ as Deloitte's fee for the 2020 Audit. Fee Proposal, Exhibit 10, Viele Declaration.

### E.    Katerra's Bankruptcy Petition and Plan

63.    On June 6, 2021 ("Petition Date"), the Debtors commenced these chapter 11  cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

64.    On July 9, 2021, the Katerra Debtors filed their respective Schedules of Assets and Liabilities (each a "Schedule" and, collectively, the "Schedules") and Statements of Financial Affairs (each, a "Statement" and, collectively, the "Statements" together, the "Original Schedules and Statements") [Case No. 21-31861, Docket Nos. 438–470].  On October 6, 2021, the Katerra Debtors amended their respective Schedules and Statements (the "Amended Schedules and Statements", together with the Original Schedules and Statements, the "Schedules and Statements") [Case No. 21-31861, Docket Nos. 1228- 1260].

65.     Deloitte was scheduled with a general unsecured claim in the amount of $2,041,073.00 (the "Deloitte Scheduled Claim").

66.     On October 21, 2021, the Court entered the *Order (I) Approving the Disclosure Statement and (II) Confirming the Amended Joint Chapter 11 Plan of Katerra Inc. and its Debtor Subsidiaries* [Case No. 21-31861, D.I. 1372] (the "Confirmation Order"), confirming the Debtors' *Amended Joint Chapter 11 Plan* (the "Plan") [Case No. 21-31861, D.I. 1338] which became effective on October 29, 2021 [Case No. 21-31861, D.I. 1422] (the "Effective Date").

67.     The Confirmation Order provides that, "On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned . . . ***shall be deemed rejected*** pursuant to sections 365 and 1123 of the Bankruptcy Code [unless specifically assumed or the contract is for insurance]." Case No. 21-31861, D.I. 1372 ¶ 112 (emphasis added).

68.     The Deloitte Engagement Letters are not specifically referenced as assumed contracts anywhere in the Plan (or plan supplements) and therefore, are deemed rejected pursuant to the terms of the Plan.

69.     On November 23, 2022, pursuant to Bankruptcy Rule 1009, Katerra filed an amendment to its Schedules and Statements by filing an amended Schedule E/F, Part 2, to update certain nonpriority unsecured claims (the "Schedule E/F Amendment").  The Schedule E/F Amendment updates the classification of the Deloitte Scheduled Claim to be a "disputed" claim [Case No. 21-31861, D.I. 1890] (the "Amended Deloitte Scheduled Claim").

70.     Pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of*

*Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* (the "Bar Date Order") [Case No. 21-31861; D.I. 427], if Deloitte disagreed with the nature, amount, characterization and/or classification of the Amended Deloitte Scheduled Claim, then it was required to file a proof of claim in accordance with the Bar Date Order, by no later than 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days from the date the notice of the Schedule E/F amendment was mailed, i.e. December 23, 2022.[5]

71.    Deloitte did not file a proof of claim in the Chapter 11 Cases, despite having outstanding invoices totaling $2,041,073.00.

## LEGAL ARGUMENT

72.    As set forth in more detail herein, this Court should deny the Motion to Compel because (i) Deloitte has not demonstrated that the parties agreed to arbitrate this dispute; and (ii) even if the Court decides that the Arbitration Provision is valid the objectives of the Bankruptcy Code prevent the Court from enforcing the Arbitration Provision.

73.    First, there is no valid and enforceable arbitration agreement.  The Engagement Letters are executory contracts *i.e.* contracts with mutual, material obligations that were not fully performed as of the Petition Date.  Deloitte admits that the Plan rejected executory contracts, unless expressly assumed, which the Engagement Letters were not.  Further, the Engagement Letters are illusory contracts, under well-settled principles of Texas contract law.

74.    Second, even if the Court decides that the Arbitration Provision is valid, it still has discretion to deny its enforcement and should exercise that discretion given the important Bankruptcy Code objectives at stake in this matter including, but not limited to, this Court's

---

[5] *See Affidavit of Service* [Case No. 21-31861; D.I. 1893].

oversight of a significant potential recovery for the estate's creditors, the importance of conserving

estate assets, and the avoidance of piecemeal litigation.

### A.     The Bankruptcy Court May Decide Questions of Arbitrability

75.     As a threshold matter, this Court may rule on the Motion to Compel.

76.     Deloitte has not demonstrated by "clear and unmistakable" evidence that the parties

agreed that an arbitrator, rather than court, should decide the arbitrability of this proceeding.  *First*

*Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  And it cannot.

77.     Deloitte glides past the standard set by the Supreme Court for examining whether

a party has agreed to let an arbitrator decide arbitrability.   "Courts should not assume that the

parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that

they did so." *First Options of Chicago*, 514 U.S. at 944 (*quoting AT & T Techs., Inc. v. Commc'ns*

*Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide

otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not

the arbitrator.")).

78.     This "clear and unmistakable" standard has been referred to as a heightened

standard.  *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70, n. 1 (2010) ("There is one caveat

[to the principle that arbitration is a matter of contract]. [*First Options of Chicago*] held that

'[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r]

and unmistakabl[e]' evidence that they did so.' The parties agree the *heightened standard* applies

here.") (emphasis added).

79.     To create its argument, Deloitte wrongly relies on *Henry Schein, Inc. v. Archer and*

*White Sales, Inc.,* 139 S.Ct. 524 (2019) for the proposition that "[w]hen the parties' contract

delegates the arbitrability question to an arbitrator, a court may not override the contract."  *Henry*

*Schein*, 139 S.Ct at 529.

80.    However, *Henry Schein* does not abrogate or change the standard that delegation of arbitrability must be clear and unmistakable.  Instead, the Supreme Court addressed the narrow question about whether courts could apply an exception to enforcing a delegation of arbitrability provision and decide arbitrability itself in the first instance if the court found that the arguments for arbitration were "wholly groundless."  The Supreme Court held that the "'wholly groundless' exception is inconsistent with the text of the Act and with our precedent."  *Id.*

81.    Expressly reiterating its prior holdings, the Supreme Court stated:

> We express no view about whether the contract at issue in this case in fact delegated the arbitrability question to an arbitrator. The Court of Appeals did not decide that issue. Under our cases, courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options*, 514 U.S., at 944, 115 S.Ct. 1920 (alterations omitted). On remand, the Court of Appeals may address that issue in the first instance, as well as other arguments that Archer and White has properly preserved.

*Id.* at 531.

82.    In fact, on remand, the Fifth Circuit found that the parties did not clearly and unmistakably agree to defer the question of arbitrability to an arbitrator when the arbitration provision in the distributorship agreement contained a carve-out from arbitration for certain kinds of relief or claims (injunctive relief and trademark claims in this case).  *See Archer and White Sales, Incorporated v. Henry Schein, Incorporated*, 935 F.3d 274, 281-82 (5th Cir. 2019) ("Given that carve-out, we cannot say that the Dealer Agreement evinces a 'clear and unmistakable' intent to delegate arbitrability.").  The Court has a role in deciding arbitrability and determining whether there is clear and unmistakable intent to defer such a question to an arbitrator.

83.    The Court should also note the differences between this matter and *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671 (5th Cir. 2012), which Deloitte cites

17

for the proposition that "the express adoption of [American Arbitration Association Construction Industry Arbitration Rules ("AAA Construction Rules")] presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." 687 F.3d at 675.[6]

84.     While adoption of the AAA Construction Rules may have been held to satisfy the "clear and unmistakable" standard in *Petrofac*, the AAA Construction Rules are not at issue in this case.  As Deloitte clearly states, the rules cited in the Arbitration Provision are the CPR Rules for Non-Administered Arbitration (the "CPR Rules").[7]

85.     Additionally, while the CPR Rules are cited for the *conduct of the arbitration,* not necessarily about deciding threshold questions of arbitrability, the Arbitration Provision does not adopt wholesale the CPR Rules (modifications are contemplated and contained therein) as to the powers of the arbitrator or the panel.  Thus, there is no clear and unmistakable expressed intent of the parties to defer questions of arbitrability to an arbitrator.  For this reason, Deloitte has not demonstrated the parties' "clear and unmistakable intent" to take the arbitrability question out of the Court's purview and delegate it to an arbitrator.

86.     Notably, the International Institute for Conflict Prevention & Resolution (the "IICPR"), which puts forth the CPR Rules, does not think adoption of the CPR Rules alone without more express delegation language is sufficient to meet the "clear and unmistakable" standard:

> "The Tribunal may decide challenges to its jurisdiction (Rule 8). This should allow arbitrators to decide all issues, including arbitrability questions, without the necessity for court intervention. ***As the current law is in flux, parties may wish to include a specific***

---

[6] Specifically, Rule 9 states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."  American Arbitration Association, Construction Industry Arbitration Rules and Mediation Procedures, https://www.adr.org/sites/default/files/ConstructionRules_Web_0.pdf, (last accessed March 17, 2023).

[7] The Dispute Resolution Provisions state: "The arbitration shall be conducted solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the arbitration, except to the extent modified by this Dispute Resolution Provision (the 'Rules')."

> ***delegation of authority to decide arbitrability in their arbitration
> clause***."[8]

87.     As evidenced by the IICPR itself, the language of the CPR (to the extent it is
incorporated into the Engagement Letters) requires a more express manifestation of intent to
delegate arbitrability to an arbitrator than a simple reference to the CPR Rules.  Therefore, this
Court should decide whether the parties are required to arbitrate their dispute.

### B.     Deloitte Has Not Met its Burden to Demonstrate that the Parties Agreed to Arbitrate

88.     Deloitte has not met its burden, as movant, to demonstrate that the parties agreed
to arbitrate this dispute pursuant to a valid and enforceable arbitration agreement. *See Taylor v.
Community Bankers Securities, LLC*, 2012 WL 6630542 (S.D. Tex. Dec. 19, 2012).

89.     Courts in the Fifth Circuit use a two-step inquiry to determine whether an
arbitration clause is enforceable as it relates to the dispute in question. *See Banc One Acceptance
Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004).  First, courts must determine whether the parties
agreed to arbitrate the dispute. *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir.
2002). Second, courts must examine "'whether legal constraints external to the parties' agreement
foreclose[s] the arbitration of those claims.'" *Id*. (*quoting Mitsubishi Motors Corp. v. Soler
Chrysler–Plymouth, Inc*., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

90.     As to the first step, courts employ an additional two-part analysis in determination
of whether parties have agreed to arbitrate a dispute: "'(1) whether there is a valid agreement to
arbitrate between the parties; and (2) whether the dispute falls within the scope of that arbitration

---

[8]   CPR Rules Commentary, General Commentary, Salient Features of the Rules,
https://drs.cpradr.org/rules/arbitration/non-administered/2018-cpr-non-administered-arbitration-rules (last accessed
March 17, 2023) (emphasis added); *see also id.,* Commentary on Individual Rules, Rule 8. Challenges to The
Jurisdiction of The Tribunal (same proposition).

agreement.'" *Gross v. GGNSC Southaven*, L.L.C., 817 F.3d 169, 176 (5th Cir. 2016) (*quoting Tittle v. Enron Corp.*, 463 F.3d 410, 418-19 (5th Cir. 2006)); *see also Webb v. Investacorp Inc.*, 89 F.3d 252, 258 (*citing Daisy Mfg. Co. v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994); *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990)).[9]

### C.   The Parties Did Not Agree To Arbitrate This Dispute and No Valid Arbitration Agreement Exists

#### I.   The Engagement Letters Are Executory Contracts That Were Rejected by the Plan

91.    The Engagement Letters are executory contracts that were rejected by the Plan.

92.    First, Deloitte acknowledges both that 1) Plaintiff is permitted, pursuant to Section 365 of the Bankruptcy Code and subject to court approval, to "assume or reject any executory contract…of the debtor" (11 U.S.C. § 365(a)) and 2) the plain language of the Plan, which was approved by this Court dictates that executory contracts "not previously rejected, assumed, or assumed and assigned…shall be deemed automatically rejected pursuant to section [] 365" (Plan at Article V, ¶ A).

93.    Deloitte also recognizes that, as held by the Fifth Circuit, a contract is executory if performance remains due to some extent on both sides at the time of the bankruptcy filing and the

---

[9] Plaintiff's claims do not fall within the scope of the Arbitration Provision. In order to escape the continuing nature of its obligations under GAAS, Deloitte argues that all of its obligations end when it issues its audit opinion and is paid for that opinion. *See* Motion to Compel, ¶ 39. It creates this argument because it realizes that if it has continuing obligations as of the Petition Date, the Engagement Letters would be (and were) subsequently were rejected under the Plan. In order to escape the fact the Engagement Letters were rejected, Deloitte seems to be arguing that any continuing obligations are not a part of the Engagement Letters. Instead, if the obligations exist, they exist separately under GAAS and are not continuing contractual obligations. This would mean that these ongoing obligations are not subject to the Arbitration Provision because they are not part of the contract. Accordingly, Plaintiff's claims, which are based in part on these ongoing obligations, are not within the scope of the Arbitration Provision and the Motion to Compel should be denied. If Deloitte modifies its argument in a reply brief to escape the illogic of its original position, Deloitte is then expressly arguing that all post audit opinion obligations are solely those of Katerra and, therefore, the arbitration requirement is illusory, *see* Section C, IV.

failure of either party to complete performance would constitute a material breach of the contract. *See In re Falcon V, L.L.C.*, 44 F.4th 348, 355-56 (5th Cir. 2022).

94.     However, Deloitte incorrectly asserts that the Engagement Letters were not executory because they were services agreements and that such services were "over" and paid for as of the Petition Date.  *See* Motion to Compel, ¶ 39 ("D&T completed its last relevant audit in May 2020, more than a year before Katerra filed for bankruptcy—and Katerra paid D&T for those services.")  Motion to Compel, ¶ 39.

95.     However, it is well-settled law that "a contract is executory if 'performance remains due to some extent on both sides.'" *Matter of Provider Meds*, L.L.C., 907 F.3d 845, 851 (5th Cir. 2018) (*quoting Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.*), 15 F.3d 60, 62-63 (5th Cir. 1994)).

96.     A review of the numerous ongoing, material obligations on both sides that were unperformed as of the Petition Date demonstrate that the Engagement Letters are, in fact, the types of contracts that are recognized as executory contracts in the Fifth Circuit and/or under Texas law.

97.     Deloitte fails to address any of these provisions in the Motion to Compel, and thus has waived the argument.

       **II.     Executory Contracts: Unperformed Material Obligations On Both Sides as of the Petition Date**

98.     The Fifth Circuit has ruled "that a contract is executory if 'performance remains due to some extent on both sides' and if 'at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party.'" *Matter of Provider Meds*, L.L.C., 907 F.3d at 851 (*quoting In re Murexco Petroleum*, 15 F.3d at 62-63 (5th Cir. 1994)).  State law governs whether "each side

has at least one material unperformed obligation as of the bankruptcy petition date." *Falcon*, 44 F.4th at 352.[10]

99.     In *ConocoPhillips Co. v. Noble Energy, Inc.*, 462 S.W.3d 255 (Tex. App. 2015), a Texas appellate court determined that an exchange agreement involving the exchange of oil and gas assets in Louisiana was an executory contract within section 365, despite defendant's argument, like Deloitte, that the agreement was fully performed at the time of the petition date.

100.     An oil production company, ConocoPhillips, brought suit against Noble, an oil field leaseholder, claiming Noble had an obligation to indemnify ConocoPhillips for hazardous waste claims pursuant to a certain exchange agreement that was assumed by Noble.

101.     ConocoPhillips argued that the exchange agreement was executory because of the mutual indemnification and environmental cleanup obligations.  *See id.* at 271.  Like Deloitte, Noble claimed that the exchange agreement was not executory because it was for services that were "fully consummated and performed" and noted that certain of the unperformed obligations were "for ***future, contingent*** environmental liabilities." *Id*. at 272 (emphasis added).

102.     The Texas appellate court stated that "***[c]ontingent material obligations*** are sufficient to render a contract executory."  *Id*. at 273 (emphasis added) (*citing In re Safety–Kleen Corp.,* 410 B.R. 164, 168 (Bankr. D. Del. 2009)).  The court reasoned that "a contingent material obligation, even though not yet triggered on a debtor's petition date, ***is nevertheless executory until expiration of the contingency*** because '[u]ntil the time has expired during which an event triggering a contingent duty may occur, the contingent obligation represents a continuing duty to

---

[10] This definition of executory contracts was first proposed by Professor Vern Countryman and is known as the "Countryman test." *Id*.; *see Vern Countryman, Executory Contracts in Bankruptcy: Part* I, 57 MINN. L. REV. 439, 460 (1973).  The Court should note that various cases in the Fifth Circuit or Texas Bankruptcy and District Courts analyze "executory contract" under the *Countryman* definition but do not expressly reference Texas state law. However, the definition under state law and under *Countryman* are essentially identical.

stand ready to perform if the contingency occurs.'" *Id.* (emphasis added) (*citing Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.*), 756 F.2d 1043, 1046 (4th Cir. 1985)).

103.    The Texas court then held that the exchange agreement was executory because it contained "continuing, mutual, future, largely unperformed, material obligations." *ConocoPhillips Co.*, 462 S.W.3d at 275.

104.    Similarly, in *Giddings Petroleum Corp. v. Peterson Food Mart, Inc.*, 859 S.W.2d 89, 92 (Tex. App. 1993), the court found that an agreement for sale of a gas station was executory where the seller and buyer agreed to post-sale ongoing obligations for the supply and purchase of gasoline and for the buyer to indemnify the seller from liability for damages caused by the buyer or its agents.  Notably, the *Giddings* court found that the contract was executory where, like here, the indemnification obligation was held by only one party.

105.    In *Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 852 (5th Cir. 2018), the Fifth Circuit affirmed the lower court's findings that certain ongoing contractual obligations were material; *i.e.*, the provision of quarterly reports by licensee, payment of a license fee, and licensee's promise to refrain from making public statements about a settled lawsuit, rendering license agreement to be an executory contract.  *See also In re Kemeta, LLC*, 470 B.R. 304, 325 (Bankr. D. Del. 2012) (finding executory contract existed where both parties had ongoing obligations as of the petition date *i.e.* duty to obtain third party consents, duty to execute documents, and duty to notify of license infringements); *In re Energy Conversion Devices, Inc.*, 621 B.R. 674, 711 (Bankr. E.D. Mich. 2020) (finding licensing agreement was an executory contract where the parties had continuing obligations including "duty to indemnify"); *Innovative Clinical Solutions, Ltd. v. Clinical Research Center P.C.*, 173 F.Supp.2d 826, 830 (C.D. Ill. 2001) (holding agreement to be

23

an executory contract where each party still had substantial obligations to perform at the time of filing).

106.    As set forth above, as of the Petition Date, both sides had significant unperformed obligations, similar to the types of unperformed obligations in the case law cited above, such that "the failure of either to complete performance would constitute a material breach excusing performance of the other." *Falcon V, L.L.C.*, 44 F.4th at 352.

107.    ████████████████████████████████████████████████████

████████████████████████████████████████████ Exhibits B-D to Complaint at pages 179, 193-94, 205; Shamah Decl., Exhibit 5 at page 8.  The Company also had

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ Exhibits B-D to Complaint at pages 175, 188-89, 201; Shamah Decl., Exhibit 5 at 25-5, page 4.

108.    Even more broadly, the Engagement Letters contained a survival clause, which purported to bind the Company to "the agreements and undertakings of [Katerra] contained in the engagement letter" after "termination of this engagement." Exhibits B-D to Complaint at pages 182, 196, 208; Shamah Decl., Exhibit 5 at page 11.  Thus, by the terms of the Engagement Letter, any and all of Katerra's obligations—not just the Arbitration Provision, but all "agreements and undertakings of [Katerra] contained in the engagement letter"— were preserved, and in certain material aspects, unperformed, as of the Petition Date.  *Id.*

109.    As to Deloitte, the auditor had unperformed obligations under the Engagement Letters and GAAS.  Deloitte was required to ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ GAAS, ██████████

█████████████████████████████████, expressly states that such obligations are continuing on

the part of Deloitte, even if the auditor is terminated or withdraws.

110.    These provisions alone would render the Engagement Letters executory contracts.

111.    However, the SEC Investigation and Deloitte's ongoing work analyzing the Katerra

financial statements, simply reinforces the executory nature of the agreements.

112.    Deloitte claims that it had finalized an audit of Katerra's financial statements for

the year ending December 31, 2019, by submitting a clean auditing opinion to Katerra on May 13,

2020.  However, its performance with respect to the 2019 Audit was far from complete.

113.    As set forth above, and as required by GAAS and the Engagement Letters, Deloitte

had ongoing obligations due to the subsequently discovered financial misconduct affecting its

audit of Katerra's financial statements.

114.    Deloitte was an active participant in Katerra's internal Renovations and Katerra

West Investigations, identifying key witnesses for Katerra's attorneys and providing documents to

the SEC.  As of December 2020, Deloitte had ███████████████████████████████████████

███████████████████████████.

115.    There are likely many more aspects of Deloitte's participation in the SEC

Investigation, including Deloitte's own work to determine if the 2019 Audit needed to be modified,

that have not even been disclosed to Plaintiff and may be revealed through discovery.

116.    ████████████████████████████████████████████████████████

████████████████

117.    Accordingly, Deloitte's obligations under the Engagement Letters and GAAS, were not complete as of the Petition Date.

118.    In addition, Deloitte had been engaged to audit Katerra's year-end 2020 financial statements, the performance of which was not completed due to Katerra's bankruptcy, as Deloitte admits.  *See* Motion to Compel, ¶ 6.  Deloitte had engaged in some work for the 2020 Audit, as evidenced by its unpaid invoices to Katerra; however, the main objective of the 2020 Engagement Letter had not been completed by Deloitte.  The 2020 Audit would necessarily have included a comparison with the 2019 financial statements.

### III.    This Court is Not Required To Compel Arbitration Under *Mission Product*

119.    As set forth below, Fifth Circuit precedent holds that a trustee cannot be compelled to arbitrate pursuant to a rejected executory contract.  *See Janvey v. Alguire*, 2014 WL 12654910 (N.D. Tex. Jul. 30, 2014), *affirmed by* 847 F.3d 231 (5th Cir. 2017).  Another recent case within the Fifth Circuit also supports this proposition.  *In re Highland Cap. Mgmt., L.P.*, 2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021)

120.    This Court has further grounds to deny enforcement of the Arbitration Provision based on the holding of *In re Highland Cap. Mgmt.,* 2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021).  In *Highland*, the Northern District of Texas Bankruptcy Court expressly ruled that non-debtor parties to a rejected executory contract could not seek specific performance of the rejected contract's arbitration provisions.  *See id.* at *3-7.

121.    Highland, a reorganized debtor, filed suit against obligors under certain notes, alleging, among other things, breach of contract, turnover, and fraudulent transfers.  Defendants moved to compel and to stay litigation pending arbitration, pursuant to an arbitration provision in

the agreement at issue in the lawsuit.  The parties agreed that such agreement was executory and rejected under section 365 of the Bankruptcy Code.

122.    The *Highland* court acknowledged the prior case law favoring the enforcement of arbitration clauses under the FAA.  Ultimately, the court held that "although 'arbitration survives the contract' ***as a matter of contract law***, 'executory obligations may be avoided by the trustee as a matter of bankruptcy law through the exercise of the trustee's power to reject executory contracts.'"  *Id.* (emphasis included in original) (*citing* Jay Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 Univ. of Minn. Law School 595, 623 (1983)).  The court continued, "[i]f specific performance is not available against a trustee, it follows that an arbitration agreement is like any other executory contract which the trustee may reject."  *Id.* (*citing* Westbrook, *The Coming Encounter* at 624) (internal quotations omitted).

123.    The *Highland* court relied directly on *Janvey v. Alguire*, 2014 WL 12654910 (N.D. Tex. Jul. 30, 2014), with facts analogous to the matter before the Court.  In *Janvey*, a federal receiver, who took possession of assets in a large ponzi scheme at the request of the SEC, filed suit against former employees of the ponzi scheme orchestrator for fraudulent transfers and unjust enrichment.  The employees filed motions to compel arbitration based on arbitration clauses in various documents to which they were signatories.  The receiver had not adopted the arbitration agreements at issue.

124.    The Northern District of Texas, later affirmed by the Fifth Circuit, declined to compel arbitration on various grounds, looking to the same *Countryman* standard that is prevalent throughout the circuit courts of appeal in the analysis of the enforcement of arbitration clauses. Citing Westbrook, considered "the modern-day expert on executory contracts in bankruptcy," the court reasoned that the receiver had rejected the arbitration agreement and that such arbitration

agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought. *Janvey*, WL 12654910 at *9.

125.    Thus, the court continued, "the appropriate remedy in this circumstance cannot be for the Court to require specific performance by the trustee — i.e., to compel arbitration — because 'injured part[ies] cannot insist on specific performance by the trustee.' *Id*. (citations omitted).

126.    Rather, the injured party may file a claim for monetary damages against the estate. *Highland*, 2021 WL 5769320, at *7. As of the Petition Date, Deloitte could have asserted a claim that approximately $2 million was owed by Katerra to Deloitte for services performed for the audit of Katerra's 2020 financial statements and a rejection damage claim. Deloitte elected not to file such a claim.

127.    Given the close factual similarities to *Highland* and *Janvey*, this Court should determine that Plaintiff cannot be compelled to specifically perform pursuant to the arbitration provision, since the Engagement Letters were rejected. Filing a claim against the estate was Deloitte's remedy for the rejection of the Engagement Letters; not specific performance through the Motion to Compel.

128.    Deloitte relies heavily on the holding of *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) for the proposition that Deloitte is entitled to arbitrate under the Engagement Letters, even if the Plan rejected the Engagement Letters.

129.    In *Mission Product*, a debtor rejected a licensing agreement pursuant to section 365 of the Bankruptcy Code. *See id.* at 1658. The debtor sought a declaratory judgment from the bankruptcy court, terminating the rights it had granted to the trademark licensee under the licensing

agreement.  *See id*. at 1659.  The Supreme Court held that the debtor could not revoke the trademark license when the debtor rejected the license agreement.  *See id.* at 1666.

130.    The Supreme Court found that "rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach" (*Id*. at 1661) and that upon rejection, the debtor may "stop performing under the contract," leaving the non-debtor counterparty to assert … a pre-petition claim in the bankruptcy proceeding for damages resulting from [the debtor's] nonperformance. *Id.* at 1659.  Both of these principles are consistent with the reasoning and holdings of *Highland* and *Janvey*.

131.    Where *Mission Product* is distinguishable from *Highland* and *Janvey* is the contractual right at issue: the granting of a license.  The Supreme Court reasoned that:

> Many licensing agreements involving trademarks or other property are of that kind (including, all agree, the Tempnology-Mission contract). The licensor not only grants a license, but provides associated goods or services during its term; the licensee pays continuing royalties or fees. If the licensor breaches the agreement outside bankruptcy (again, barring any special contract term or state law), everything said above goes. In particular, the breach does not revoke the license or stop the licensee from doing what it allows. See, *e.g., Sunbeam*, 686 F. 3d at 376 ("Outside of bankruptcy, a licensor's breach does not terminate a licensee's right to use [the licensed] intellectual property"). And because rejection "constitutes a breach," § 365(g), the same consequences follow in bankruptcy. The debtor can stop performing its remaining obligations under the agreement. But the debtor cannot rescind the license already conveyed. So the licensee can continue to do whatever the license authorizes.

*Id.* at 1662–63.

132.    It is clear that the Supreme Court's decision to maintain the licensee's contractual rights under the agreement after the agreement was rejected under section 365 of the Bankruptcy Code rested largely on the fact that such right was a trademark license.  As described above, the licensee enjoyed the right to use the trademark before the breach/rejection.  Once the contract is

breached/rejected, the debtor cannot "rescind the license *already conveyed*." *Id*. (emphasis added). This marks a key difference between *Mission Product* and the facts at bar.

133.    Here, no arbitration had been commenced.   Plaintiff is not requesting that an arbitration that had already been filed pre-petition be stayed pending the litigation of this proceeding, akin to what the debtor in *Mission Product* sought.

134.    Rather, Plaintiff argues that the Plan rejected the Engagement Letters, and as agreed by the Supreme Court, Plaintiff is "permitted to stop performing under the contract." *Id*. at 1659, 1662-63.  *Mission Product* has a specific holding, that a debtor must allow a counterparty to a rejected executory contract to exercise its "continuing rights" under such contract in the context of a right to use a trademark or license.  *Id*. at 1655.  *Mission Product*'s reasoning does not, by analogy, require a finding that a trustee must engage in specific performance of an arbitration provision, as Deloitte does not have a "continuing right" to arbitrate a matter that had not been filed as of the Petition Date.  Nor did Deloitte have a continuing right to arbitration after the Engagement Agreements were rejected.

135.    The holding of *Mission Product* does not disturb the holding in *Janvey*. The Court should note, as the Fifth Circuit recently held in *Matter of Henry*, 944 F.3d 587, 592 (5th Cir. 2019):

> To overrule one of our precedents, a "Supreme Court decision must be more than merely illuminating with respect to the case before us." *Martin v. Medtronic, Inc*., 254 F.3d 573, 577 (5th Cir. 2001). Instead, "a panel of this court can only overrule a prior panel decision if '***such overruling is unequivocally directed by controlling Supreme Court precedent***.' " *Id*. (*quoting United States v. Zuniga-Salinas*, 945 F.2d 1302, 1306 (5th Cir. 1991)).

*Id.* at 591 (emphasis added).

136.     Accordingly, this Court should find that pursuant to *Janvey*, and later *Highland*, arbitration cannot be compelled here.

### IV.     The Arbitration Provision in the Engagement Letters is Illusory and Therefore Not Enforceable

137.     Each of the Engagement Letters contain the following provision: "The agreements and undertakings of [Katerra] contained in the engagement letter will survive" the "termination of this engagement."  (Exhibits B-D to Complaint at pages 182, 196, 208; Shamah Decl., Exhibit 5 at page 11).

138.     A plain reading of the survival clause indicates that it applies *only* to Katerra and that Deloitte's "agreements and undertakings" in the Engagement Letters **do not** survive the termination of the engagement.  *See CKB Assocs., Inc. v. Moore McCormack Petroleum Inc.,* 734 S.W.2d 653, 655 (Tex. 1987) (maxim *expressio unius est exclusio alterius,* under which "the naming of one thing excludes another" applies to contractual interpretation).

139.     In other words, if Deloitte's arguments are correct, the termination of the Engagement Letters results in Katerra alone being bound by the Arbitration Provision with Deloitte free to pursue litigation in whatever forum it desires.  The Engagement Letters would then allow Deloitte to unilaterally avoid the obligation to arbitrate while simultaneously forcing Katerra to arbitrate.

140.     Or, if Deloitte is *arguendo* correct that each Engagement Agreement is not executory because each was fully performed, any surviving obligations – including an obligation to arbitrate disputes – would only apply to Katerra and, therefore, is illusory.

141.     In either circumstance, the Arbitration Provision of the Engagement Letters are illusory because they give Deloitte the unilateral and unrestricted right to avoid arbitration.

142.    When arbitration provisions are illusory, they are unenforceable.  "[M]ost courts that have considered this issue have held that, if a party retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 231, n. 2 (Tex. 2003).  An "arbitration agreement may be illusory if a party can unilaterally avoid the agreement to arbitrate." *Torres v. S.G.E. Mgmt., L.L.C.*, 397 F. App'x 63, 65 (5th Cir. 2010); *see also Morrison v. Amway Corp.*, 517 F.3d 248, 257 (5th Cir. 2008) (holding that an arbitration agreement was illusory because it allowed for Amway to unilaterally amend the arbitration agreement).[11]

143.    As stated by the Fifth Circuit:

> Under Texas law, "[a]n agreement to arbitrate, like other contracts, must also be supported by consideration." *Mendivil v. Zanios Foods, Inc.*, 357 S.W.3d 827, 831 (Tex.App.-El Paso 2012). Thus, "when a purported bilateral contract is supported only by illusory promises, there is no contract." *Id.* at 832. As it relates specifically to arbitration agreements, the "[m]utual agreement to arbitrate claims provides sufficient consideration to support an arbitration agreement." *In re 24R, Inc.*, 324 S.W.3d 564, 566 (Tex. 2010). ***Where one party has the unrestrained unilateral authority to terminate its obligation to arbitrate, however, the agreement understandably is illusory***. *See id.* at 567 ("An arbitration clause is

---

[11] When determining the validity of the arbitration provision, the Court should apply Texas law.  First, there is no choice of law provision as it applies to this Court.  The Arbitration Provision specifically states "[t]he Arbitrator shall apply New York law".  A plain reading of the Engagement Letter limits the applicability of New York law to an Arbitrator during arbitration – not to interpreting whether the arbitration provision itself is valid, as is at issue here.  *Wagner v. Apache Corp.*, 627 S.W.3d 277 (Tex. 2021) ("In construing a contract, including an arbitration provision, our primary concern is to determine the intent of the parties as expressed by the plain language of the contract.").  As the contract does not extend the application of New York law to the Courts, this Court should apply federal law.  "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state, which respect to the issue, has the most significant relationship to the transaction and the parties…" *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 W.S.2d 50,53 (Tex. 1991).  *See also Desantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990) (holding that where the contract was signed and performed by a plaintiff who is a citizen of Texas, the laws of Texas apply).

Generally the laws of the contract will govern, but parties to a contract cannot "thwart or offend the public policy of the state the law of which ought otherwise to apply."  *In re Guevara*, 409 B.R. 442, 446 (Bankr. S.D. Tex. 2009).  Courts will analyze what law should apply by reviewing a few different factors: significant relationship between the parties and transaction and the chosen state, and whether the forum state has a materially greater interest in deciding the issue, and whether application of the chosen state law would be contrary to fundamental public policy of the forum state.  *Id.* at 446-47.

> not illusory unless one party can avoid its promise to arbitrate by amending the provision or terminating it altogether."). This is not to say that if a party retains any ability to terminate the agreement, the agreement is illusory. Instead, retaining termination power does not make an agreement illusory so long as that power 1) extends only to prospective claims, 2) applies equally to both the employer's and employee's claims, and 3) so long as advance notice to the employee is required before termination is effective. *In re Halliburton Co.*, 80 S.W.3d 566, 569–70 (Tex. 2002).

*Lizalde v. Vista Quality Markets*, 746 F.3d 222, 225–26 (5th Cir. 2014) (emphasis added).

144.    The Fifth Circuit put it more plainly, stating that if one party can unilaterally avoid the arbitration agreement, then the arbitration agreement was illusory from the start:

> Under Texas law, an arbitration clause is illusory if one party can "avoid its promise to arbitrate by amending the provision or terminating it altogether." *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010). Put differently, ***where one party to an arbitration agreement seeks to invoke arbitration to settle a dispute, if the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset.***

*Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (emphasis added).

145.    The Arbitration Provision is illusory because it allows Deloitte to unilaterally avoid arbitration and fails to satisfy the *Haliburton* exception.  Because the survival clause only purports to bind Katerra, Deloitte has no obligation to arbitrate.  The Arbitration Provision is illusory, and therefore unenforceable.

### D.    The Objectives of the Bankruptcy Code Prevent Enforcement of the Arbitration Provision

146.    If the Court determines that the parties agreed to arbitrate the dispute, it should still deny the Motion to Compel because legal constraints foreclose arbitration of Plaintiff's claims. *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (*quoting Mitsubishi*, 473 U.S. at 628).

147.    "Bankruptcy may be one of the legal constraints foreclosing arbitration..." (*In re Laubenstein*, 2021 WL 857142, at *2 (M.D. Fl. Mar. 7, 2021) (citations omitted)), if the matter satisfies both prongs of the two party inquiry set forth in *In re National Gypsum*, 118 F.3d 1056 (5th Cir. 1997).

148.    Under *Gypsum*, a bankruptcy court may decline to enforce arbitration provisions: when (1) a matter is core or derives from rights under the Bankruptcy Code; and (2) enforcement of the arbitration provision would irreconcilably conflict with the purposes or goals of the Bankruptcy Code. *See id*. at 1065-67.

### I.    Prong 1: The Complaint Involves a Core Claim

149.    Plaintiff has asserted a claim for the avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 544(b), 548(b), 550, and 551.  This is indisputably a core claim, brought directly under sections of the Bankruptcy Code.  *See* 28 U.S.C. § 157(b)(1) (bankruptcy courts "may hear and determine all ... core proceedings arising under title 11 ... and may enter appropriate orders and judgments, subject to review under [28 U.S.C. § 158]."

150.    A bankruptcy trustee is charged with the duty to maximize the value of the bankruptcy estate for creditors. *In re Huffman*, 486 B.R. 343, 354 (Bankr. S.D. Miss. 2013) (*citing* 11 U.S.C. § 704).  To accomplish this task, a trustee is authorized, as the representative of the estate, to "commence and prosecute any action or proceeding in behalf of the estate before any tribunal." *Id.* (*citing* Fed. R. Bankr. P. 6009; 11 U.S.C. § 323).

151.    A trustee who asserts a cause of action that is derived from the debtor's rights stands in the "shoes" of the debtor. *See id*. at 355 (citations omitted).

152.    On the other hand, a trustee who asserts claims that are not derivative of the debtor's rights stands in the "overshoes" of the creditors of the debtor and generally is not bound by the

terms of the prepetition agreements entered into by the debtor. *Id.* (*quoting Kittay v. Landegger (In re Hagerstown Fiber Ltd. Pship*), 277 B.R. 181, 206–07 (Bankr. S.D.N.Y. 2002)).

153.    A fraudulent transfer claim is a widely recognized example of a core claim belonging to creditors, not the debtor. *See In re Try the World,* 2021 WL 3502607, at *7 (Bankr. S.D.N.Y. Aug. 6, 2021) ("if a trustee is asserting claims that belong to the creditors – *like fraudulent transfer claims under section 548 of the Bankruptcy Code*, – the trustee is not bound by an arbitration clause, and cannot be compelled to arbitrate those claims") (emphasis added).

154.    In *In re Gandy*, 299 F.3d 489, 499 (5th Cir. 2002), the Fifth Circuit found that the debtor's fraudulent transfer claims pursuant to Sections 544, 548 and 550 "are in essence created by the Bankruptcy Code for the benefit of creditors of the estate" and provided a basis for the court to deny enforcement of an arbitration clause. *In re McCollum*, 2021 WL 4888327, at *3 (Bankr. N.D. Miss. Oct. 19, 2021) ("The [Bankruptcy] Code specifically provides for the trustee to pursue fraudulent transfer claims on behalf of the estate and its creditors, and arbitration of the fraudulent transfer claim would conflict with the purposes of the [Bankruptcy] Code"); *In re Huffman*, 486 B.R. 343, 362 (Bankr. S.D. Miss. 2013) ("…arbitration more likely conflicts with the Bankruptcy Code, when the Bankruptcy Code itself created the rights in dispute").

155.    As one bankruptcy court further described:

> Avoidance claims are not derivative of the debtor's rights, rather they are statutory claims created in favor of creditors that can only be prosecuted by a trustee or debtor in possession… (citations omitted)…***"[E]ven if the Trustee had agreed to arbitrate the fraudulent transfer claims and those disputes fell within the scope of the [a]rbitration [c]lause, the Court would nonetheless exercise its discretion to deny arbitration on the basis that fraudulent transfer claims are substantively core and that 'arbitrating the dispute would severely conflict with relevant provisions of the Bankruptcy Code."***

*In re Try the World,* 2021 WL 3502607, at *10-11 (emphasis added).

156.     The ability to bring avoidance actions is a "quintessential right" of a trustee and has a significant impact on the administration of the estate.  *Id*. at *11; *see also In re Bethlehem Steel Corp.,* 390 B.R. 784, 795 (Bankr. S.D.N.Y. 2008) ("statutory avoidance claims that belong to the trustee or debtor in possession are not subject to the Debtor's arbitration agreements").

157.     Deloitte contends that Plaintiff's fraudulent transfer claim merely "echoes the other, common law claims" in the Complaint.  Motion to Compel, ¶ 31.  The Fifth Circuit has previously rejected arguments attempting to recast fraudulent transfer claims, derived directly from the Bankruptcy Code, as "window-dressed" state law claims. *Gandy*, 299 F.3d at 494.

158.     Further, the mere fact that the fraudulent transfer claim "may be affected by state law" does not alone render the dispute non-core.  *In re Caldor, Inc*., 217 B.R. 121, 127 (Bankr. S.D.N.Y. 1998).  In determining whether a proceeding is a core proceeding, the relevant inquiry "is whether the nature of th[e] adversary proceeding, rather than the state or federal basis for the claim, falls within the core of federal bankruptcy power." *Id*. (*quoting Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp*.), 896 F.2d 1384, 1389 (2d Cir. 1990).  Thus, the mere fact that Plaintiff's non-core claims arise out of the same nexus of facts as the fraudulent transfer claim does not negate the core nature of the claim.

**II.     Prong 2: Enforcement of the Arbitration Provision Conflicts with the Objectives of the Bankruptcy Code**

159.     The Court should further find that Plaintiff's claims should not be arbitrated because an "underlying purpose of the Bankruptcy Code would be adversely affected by enforcing [the] arbitration clause." *In re Relativity Fashion, LLC*, 696 F. App'x 26, 30 (2d Cir. 2017).

160.     The Fifth Circuit recently affirmed in *Matter of Henry*, 944 F.3d 587, 592 (5th Cir. 2019) that bankruptcy courts have the discretion to override the FAA's mandate to enforce arbitration agreements where such mandate conflicts with the purpose of the Bankruptcy Code.

161.    In analyzing whether the Arbitration Provision at issue would conflict with the underlying purpose of the Bankruptcy Code, relevant considerations for the court include "(1) resolution of purely bankruptcy issues in a centralized forum; (2) protection of reorganizing debtors and creditors from piecemeal litigation; and (3) the bankruptcy court's unquestionable power to enforce its own orders." *Nat'l Gypsum*, 118 F.3d at 1069.

162.    This Court's discretion to deny enforcement of the Arbitration Provision on the grounds that enforcement would contradict the goals of the Bankruptcy Code applies not only to the fraudulent transfer claim, but to Plaintiff's non-core claims as well. *See Huffman*, 486 B.R. at 358 ("The Fifth Circuit, however, has not foreclosed the possibility, that is, that a bankruptcy court could deny arbitration of a noncore proceeding if the opposing party could show it would cause an inherent conflict of interest with the Bankruptcy Code").

163.    The Court can find support among the circuit courts of appeal that it retains discretion to deny compelling arbitration even with respect to a non-core claim where the objectives of the Bankruptcy Code are threatened.  In other words, this Court may deny the Motion to Compel as to *all* of Plaintiff's claims.

164.    The "core/non-core distinction" is "not mechanically dispositive in deciding whether a bankruptcy judge may refuse to send a claim to arbitration." *Moses v. CashCall, Inc.*, 781 F.3d 63, 83 (4th Cir. 2015) (Gregory J. concurring) (*citing Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.),* 671 F.3d 1011, 1021 (9th Cir. 2012) ("We agree that the core/non-core distinction, though relevant, is not alone dispositive.")).

165.    "Instead what ***matters fundamentally*** is whether compelling arbitration for a claim would inherently undermine the Bankruptcy Code's animating purpose of facilitating efficient reorganization of an estate through the '[c]entralization of disputes concerning a debtor's legal

obligations.'" *Id.* (emphasis added) (*quoting Phillips v. Congelton, LLC (In re White Mountain Mining Co.)*, 403 F.3d 164, 170 (4th Cir. 2005)).

166.    *In re Mirant Corp.,* 316 B.R. 234, 241 (Bankr. N.D. Tex. 2004) involved a contested matter arising out of a debtor's objection to a proof of claim filed by a creditor for damages related to the debtor's rejection of an executory contract.  The court refused to enforce an arbitration provision on the grounds that allowing an arbitrator to quantify one of the substantial creditor claims in the case would hinder its control of the bankruptcy reorganization process.  *Id.* at 244.

167.    The court reasoned that the debtor had rejected many contracts with arbitration provisions and noted that to allow the liquidation of numerous claims through various arbitration proceedings would subject debtors and creditors to piecemeal litigation.  *See id.*  The court further recognized that allowing the enforcement of arbitration provisions (many of which the debtor had already rejected) would lead to a significant drain on estate resources:

> …to permit various creditors to bypass carefully established procedures in order to force an unwilling debtor to litigate a number of actions in a number of forums merely because those creditors' contracts happen to include a standard arbitration clause" would jeopardize Debtors' resources because, "in such a world, the mere cost of defending ... various suits could deplete the corpus of substantial funds."

*Id.* at 242 (*quoting In re FRG*, 115 B.R. 72, 75 (Bankr. E.D.Pa. 1990)).

168.    Finally, the *Mirant* court noted the "expeditious and equitable distribution of the assets" of a debtor's estate as "another purpose of the Code."  *Id.* (*citing Gandy*, 299 F.3d at 498).  The bankruptcy court, not an arbitrator, has "the ability to coordinate the timing of that process with other aspects of a debtor's reorganization and ensure expeditious distribution to creditors."  *See Mirant*, 316 B.R. at 242; *see also In re Caldor*, 217 B.R. at 130 (refusing to enforce arbitration

where dispute "implicates important aspects of the Bankruptcy Code and significant estate assets and does not warrant the special expertise of an arbitrator").

169.    While the matter before this Court involves core and non-core claims, rather than a claim objection as in *Mirant*, the same underlying purposes of the Bankruptcy Code are implicated here, which should lead to the same conclusion: that arbitration should be not be compelled.

170.    Similar to the debtor in *Mirant*, Plaintiff has rejected numerous contracts (including the Engagement Letters) pursuant to the Plan.  To give effect to the Arbitration Provision in the Engagement Letters or any of the other rejected contracts would subject the Plaintiff to piecemeal litigation.

171.    Plaintiff's claims against Deloitte implicate some of the most significant estate assets and potential recoveries for creditors.  Given this Court's role in and familiarity with the Katerra Debtors' underlying bankruptcy, the estate assets, and Plan confirmation, the estate and creditors of the estate will be best served if this dispute remains in the jurisdiction of this Court rather than that of an arbitrator.  Plaintiff's claims against Deloitte, specifically the fraudulent transfer claim, derive directly from the Bankruptcy Code and should be adjudicated by this Court.  In addition, the litigation of Plaintiff's claims by an arbitrator will unnecessarily deplete estate resources, another concern raised by the court in *Mirant*.

**E.**     **In the Alternative, the Court Should Deny the Motion to Compel as to the Fraudulent Transfer Claim and Stay Arbitration Pending Resolution of the Fraudulent Transfer Claim**

172.    In the event that the Court determines that some of Plaintiff's claims are subject to arbitration and some are not, Plaintiff requests that the Court retain such claims it deems non-arbitrable and stay the commencement of arbitration of the Plaintiff's remaining claims.  *See In re S.W. Bach & Co.,* 425 B.R. 78, 87 (Bankr. S.D.N.Y. 2010) (in exercise of its authority to enter

"necessary or appropriate" orders, staying arbitration of non-core claims, pending resolution in bankruptcy court of nonarbitrable fraudulent transfer claims that arose out of same transaction).

173.    The Court should stay the commencement of arbitration pending resolution of claims it deems arbitrable for the reasons set forth in *Gandy*.  The Fifth Circuit reasoned that to bifurcate a case and allow some claims to be arbitrated while some claims proceed in court "would be wasteful and inefficient, and potentially could yield different results and subject parties to dichotomous obligations." *Gandy*, 299 F.3d at 499.

174.    Allowing Plaintiff to litigate any claims that this Court deems non-arbitrable, prior to the commencement of arbitration of any remaining claims, will allow the parties to reduce the overall scope and cost of litigation.  *See In re Try the World,* 2021 WL 3502607, at *16.

175.    Deloitte has also moved to dismiss the complaint.  That request should likewise be denied because even if the Court compels arbitration, the Court would retain jurisdiction pending the arbitration for the purpose of addressing any subsequent motions to confirm, modify, or vacate the award.  *See Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 714 (5th Cir. 2002).

<u>**CONCLUSION**</u>

176.    For all the foregoing reasons, the Court should deny the Motion to Compel in its entirety.  Deloitte has not met its burden of demonstrating that the parties agreed to arbitrate this dispute, given the illusory nature of the Engagement Letters and the Plan's rejection of the Engagement Letters.  Furthermore, even if the Court does find that Deloitte has established that a valid arbitration agreement exists, the Court still maintains discretion to deny enforcement of the Arbitration Provision because of the significant Bankruptcy Code objectives at stake in the litigation of this matter.

Dated: April 3, 2023

William Stassen (admitted *pro hac vice*)
2000 Market St.
20th Floor
Philadelphia, PA 19103-3222
Telephone: (215) 299-2853
Facsimile: (215) 299-2150
E-mail: wstassen@foxrothschild.com

-and-

Michael A. Sweet (admitted *pro hac vice*)
345 California Street, Suite 2200
San Francisco, California 94104
Telephone:  (415) 364-5540
Facsimile:  (415) 391-4436
E-mail: msweet@foxrothschild.com

-and-

Gordon E. Gouveia (admitted *pro hac vice*)
321 North Clark Street, Suite 1600
Chicago, IL 60654
Telephone:  (312) 980-3816
Facsimile:  (312) 517-9201
E-mail: ggouveia@foxrothschild.com

*/s/ Trey A. Monsour*
Trey A. Monsour, Esq.
(Tex. Bar No. 14277200)
David G. Crooks, Esq.
(Tex. Bar No. 24028168)
Adam T. Hamilton, Esq.
(Tex. Bar No. 24087655)
Fox Rothschild LLP
Saint Ann Court
2501 North Harwood Street, Suite 1800
Dallas, TX  75201
Telephone:  (214) 231-5796
Facsimile:  (972) 404-0516
Mobile:  (713) 927-7469
E-mail: tmonsour@foxrothschild.com
E-mail: dcrooks@foxrothschild.com
E-mail: ahamilton@foxrothschild.com

*Counsel to the Plan Administrator*

## **Certificate of Service**

I certify that on April 3, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Trey A. Monsour*
Trey A. Monsour
