## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| KATERRA INC., *et al.*, | ) Case No. 21-31861 (DRJ) |
| | ) |
| | ) (Jointly Administered) |
| *Debtors*. | ) |
| | ) |
| | ) |
| KATERRA INC., by and through Daniel R. Williams, as Plan Administrator on behalf of Katerra Inc. and related debtors, | ) Adv. No. 22-03344 |
| | ) |
| | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| DELOITTE & TOUCHE LLP, | ) |
| *Defendant*. | ) |
| | ) |

## DEFENDANT'S REPLY IN SUPPORT OF
## ITS MOTION TO COMPEL ARBITRATION AND DISMISS OR, IN THE
## ALTERNATIVE, STAY THE ADVERSARY PROCEEDING

## TABLE OF CONTENTS

I.     Introduction ..........................................................................................................................1

II.    The Parties Entered Binding, Enforceable Arbitration Agreements....................................3

     A.    The Arbitration Provisions Require Arbitration Of Arbitrability Questions ...........4

     B.    Katerra's Argument That The Arbitration Provisions Are Illusory Is
           Misplaced And Meritless ........................................................................................5

          1.    Katerra's "Illusory Contract" Argument Must Be Arbitrated.....................6

          2.    Katerra's "Illusory Contract" Argument Is Meritless .................................7

III.   The Bankruptcy Code Does Not Override D&T's Right To Arbitrate Katerra's
     Claims ................................................................................................................................10

     A.    Compelling Arbitration Will Not Conflict With The Bankruptcy Code .............10

          1.    Katerra's Concededly Non-Core Claims Must Be Arbitrated .................10

          2.    Katerra's Fraudulent Transfer Claim Also Must Be Arbitrated ...............11

          3.    Even If The Court Does Not Compel Arbitration Of Katerra's
               Fraudulent Transfer Claim, It Must Still Send The Other Claims
               To Arbitration ...........................................................................................13

     B.    Katerra's Rejection Of Certain Executory Contracts Does Not Eliminate
           D&T's Arbitration Rights ......................................................................................14

          1.    Katerra Has Not Shown That The Engagement Letters Are
               Executory ..................................................................................................14

          2.    Rejection Of An Executory Contract Does Not Eliminate A Party's
                Right To Arbitration .................................................................................17

IV.   The Court May Stay This Proceeding Pending Arbitration, But Should Not Stay
     Arbitration Pending Litigation............................................................................................21

V.    Conclusion .........................................................................................................................23

## I.  INTRODUCTION

1.  Five years running, plaintiff Katerra Inc. ("Katerra") and defendant Deloitte & Touche LLP ("D&T") executed audit engagement letters.  Each time the parties agreed, in unmistakable terms, that any disputes relating to those letters "shall be settled by binding arbitration."  Now that Katerra's bankruptcy plan has been confirmed, it wants to disregard those agreements and litigate its supposed professional negligence claims against D&T in this Court.  In so doing, Katerra asks the Court to ignore the plain text of the Federal Arbitration Act ("FAA") and the great weight of authority holding that arbitration agreements should be enforced unless they jeopardize the objectives of the Bankruptcy Code—a showing Katerra does not make.  Katerra also fails to show the engagement letters are "executory," and fails to address case law establishing that arbitration is required even if the engagement letters were executory and were rejected.  In short, Katerra tries every which way to escape its agreements to arbitrate disputes like this one.  It fails at every turn.

2.  Katerra's opposition brief first addresses the enforceability and scope of the arbitration agreements.  In its motion to compel, D&T showed that the parties entered valid arbitration agreements and that, even if Katerra disputed those provisions' scope or validity, any such disputes are for the arbitrator.  *See* ECF No. 24 ("Mot.") at 6–9.  Much of that stands undisputed.  Katerra takes issue with D&T's contractual showing in only two respects:  (1) whether the parties delegated arbitrability to the arbitrator, and (2) whether the arbitration agreements are "illusory."

3.  *First*, on the threshold question of "who decides," Katerra contends that the parties did not agree to delegate arbitrability questions to the arbitrator even though the operative terms in the engagement letters expressly incorporate arbitration rules that do just that.  *See* ECF No. 39 ("Opp.") at 16–19.  As D&T explained in its motion, Fifth Circuit precedent addressing near-identical rules and contract language forecloses that argument.  *See* Mot. at 8–9.

4.     *Second*, Katerra argues that the parties' agreements were "illusory," and thus invalid, because the "survival" clause in their engagement letters is one-sided—i.e., it applies to Katerra's obligations but not to D&T's.  According to Katerra, this supposed one-sidedness gives D&T a "unilateral and unrestricted right to avoid arbitration."  Opp. at 31.  That argument is both misplaced and meritless.  It is misplaced because, under the parties' arbitration agreements, any validity question like this is for the arbitrator, not the Court.  And it is meritless for many reasons, but most fundamentally because the arbitration obligations, in fact, run both ways.  Katerra's reading of the survival clause is simply wrong.  But even if the survival clause could somehow be read as Katerra urges, this still would not render the arbitration agreements "illusory" because there indisputably was consideration for its promise to arbitrate.

5.     Unable to cite any other contractual basis for disregarding its arbitration obligation, Katerra argues that its bankruptcy absolves it of that duty.  These arguments—that arbitration would (1) conflict with the bankruptcy code, or (2) be impermissible under Section 365's rejection provisions—are equally meritless.

6.     *First*, Katerra has come nowhere close to showing that compelling arbitration would conflict with the Bankruptcy Code.  *See* Opp. at 33–39.  Katerra does not give any independent reason to keep its five non-core claims in this Court.  As for its single claim for avoidance of fraudulent transfers under the Bankruptcy Code—which is based on the same facts as, but worth a tiny sliver of, the $1 billion Katerra seeks under those five, purely state and common law claims—Katerra has not shown that the Bankruptcy Code trumps the FAA's clear arbitration mandate.  Nor has it even addressed the many cases D&T cited showing that arbitration of that claim is required, too.  The Court should reject Katerra's effort to bootstrap its purportedly billion-dollar non-core claims onto this proceeding through its lone fraudulent transfer claim.  Even if the

Court were to hold that Katerra's fraudulent transfer claim belongs here (and it should not), the non-core claims—which predominate in this case—cannot remain alongside it.

7. *Second*, Katerra is wrong to assert that its broad rejection of "executory" contracts in its bankruptcy plan prohibits this Court from enforcing the arbitration agreements. *See id.* at 20–31. To begin, Katerra still has not carried its burden of showing that the engagement letters are executory. Against the undisputed fact that the core requirements of the engagement letters were completed before Katerra filed for bankruptcy—i.e., D&T had delivered the audit opinions it was engaged to deliver and Katerra had paid D&T for that work (save for the incomplete year-end 2020 audit)—Katerra identifies an assortment of supposed continuing obligations under those letters. But Katerra nowhere explains how those obligations, even if continuing, are "material." More critically, even if these contracts *were* executory *and* rejected, the Court still must compel arbitration. D&T cited a long list of cases holding that rejection of a contract does not preclude enforcing an arbitration agreement in that contract. *See* Mot. at 19–21. Remarkably, Katerra has no response to those cases. Katerra instead focuses myopically on two wrongly decided and factually distinct district court cases that D&T has already addressed and that this Court is not bound to—and should not—follow. *See id.* at 21–25.

8. This Court should compel arbitration of all of Katerra's claims and stay (or dismiss) the adversary proceeding. But if the Court does not compel arbitration of the sole fraudulent transfer claim, in no event should it stay arbitration, as Katerra suggests. The Court should then compel arbitration of Katerra's five non-core claims and stay litigation pending arbitration.

## II.   THE PARTIES ENTERED BINDING, ENFORCEABLE ARBITRATION AGREEMENTS

9. Katerra appears to agree that the parties entered valid, enforceable engagement letters for each relevant year. *See* Mot. at 6–7; Opp. at 3–7 (describing engagement letters' terms); *see*

*also* ECF No. 1 ("Compl.") ¶¶ 647–652 (asserting contract claim based on engagement letters).  It also acknowledges that these letters contained arbitration provisions requiring that "[a]ny controversy or claim between the parties arising out of or relating to" them (or the resulting engagements) be "resolved by . . . binding arbitration."  Opp. at 6 (quoting arbitration provisions).  And it does not meaningfully dispute that the broad language of those provisions covers its claims.  *See* Mot. at 9–11.[1]

10.  Katerra argues only that the arbitration agreements (1) leave questions about their scope and validity to the Court rather than the arbitrator, *see* Opp. at 16–19, and (2) are illusory, making them invalid and unenforceable, *see id.* at 31–33.  Both arguments fail.

## A.    The Arbitration Provisions Require Arbitration Of Arbitrability Questions

11.  In its motion, D&T explained that questions about the validity or "scope of the[] arbitration provisions" in the engagement letters were subject to arbitration.  Mot. at 8.  As D&T acknowledged, the Fifth Circuit requires that the parties "clearly and unmistakably" delegate such "arbitrability" questions to the arbitrator.  *See id.* (quoting *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012)).  But here, the parties did exactly

---

[1]  Oddly, one of Katerra's headings states that "The Parties Did Not Agree To Arbitrate This Dispute," Opp. at 20, but the only argument it offers for that assertion comes in a footnote, *see id.* at 20 n.9.  As an initial matter, "an argument raised in a footnote is insufficient and may be disregarded by the court."  *Gate Guard Servs. L.P. v. Perez*, 14 F. Supp. 3d 825, 833 (S.D. Tex. 2014) (collecting cases).  Preservation aside, Katerra's argument is difficult to understand.  Katerra suggests that its "claims do not fall within the scope of the Arbitration Provision[s]" because, after completing its audits, D&T had some continuing obligations under generally accepted auditing standards ("GAAS").  Opp. at 20 n.9.  But even if Katerra's claims had extended to D&T's purported failure to perform unspecified additional, post-audit GAAS duties (and it has pleaded no such thing), Katerra does not explain why those, too, would not "aris[e] out of or relat[e] to" the engagement letters.  Simply put, even if continuing GAAS obligations were relevant here (and they are not), they still would have resulted from the audit services D&T contracted to provide Katerra under the engagement letters, and so would "fall within the scope of the Arbitration Provision[s]."  *Id.*  In any event, any doubt on this issue would be a question for the arbitrator, not the Court, to resolve.  *See* Mot. at 8–9.

that by expressly incorporating into the engagement letters CPR arbitration rules that are functionally identical to AAA rules that the Fifth Circuit has already held do "clearly and unmistakably" mark such a delegation.  *See id.* at 8–9 (citing *Hurley v. Emigrant Bank*, 2019 WL 5537330, at *9 (N.D. Tex. Oct. 25, 2019), and *Shirley v. FMC Techs., Inc.*, 2020 WL 5995695, at *5 (W.D. Tex. Oct. 9, 2020), which each held that the CPR rules are indistinguishable from the AAA rules in *Petrofac*).  *Petrofac* dictates that the parties delegated arbitrability to arbitration.

12. Katerra's limited response is unpersuasive.  It notes that the AAA rules in *Petrofac* "are not at issue in this case."  Opp. at 18.  That is true, but it is also irrelevant.  As D&T explained and courts have held, the CPR arbitration rules are functionally identical to the AAA arbitration rules at issue in *Petrofac*.  *See* Mot. at 8–9 (collecting cases).  Katerra also argues that the arbitration provisions here provide only that the CPR rules will govern how the arbitration will be "conducted," so do not address how threshold arbitrability questions are to be "decid[ed]."  Opp. at 18.  But that, too, only confirms that *Petrofac*—where the Fifth Circuit likewise found that the parties had "agreed that the arbitration would be *conducted* by the [AAA] under its . . . Rules"— is dispositive.  687 F.3d at 674 (emphasis added).  Last, Katerra contends that the entity that publishes the CPR rules has acknowledged some vague "flux" in the law on this issue.  Opp. at 18– 19 (citation omitted).  But there is no "flux" in the Fifth Circuit precedent that governs.  *See Petrofac*, 687 F.3d at 675 (noting circuit split and then siding with the majority of circuits).  Under *Petrofac* and the case law applying it, provisions like the one here "clearly and unmistakably" delegate arbitrability questions to arbitration.

**B.      Katerra's Argument That The Arbitration Provisions Are Illusory Is Misplaced And Meritless**

13. Katerra next seeks to avoid the arbitration provisions by arguing they do not bind D&T to the same extent they bind Katerra and are, therefore, "illusory."  Apart from the dispositive fact

that this contention is also a question for the arbitrator, it is flawed on the merits several times over.  The parties' arbitration agreements—which are mutual on their face—*do* bind D&T even after completion or termination of the parties' engagements.  *See* Compl., Exs. B–D, App'x E § 7 (applying to "[a]ny controversy or claim between the parties").  Katerra's reliance on an unrelated survival clause, which says nothing about D&T's obligations (much less its agreement to arbitrate), is baseless—and that alone conclusively disposes of this argument.  But even if D&T (but not Katerra) somehow had the right to avoid arbitration, that still would not be "illusory" under the case law because of the many other promises each side made in the engagement letters.

### 1.    Katerra's "Illusory Contract" Argument Must Be Arbitrated

14.  As an initial matter, when parties delegate threshold arbitrability questions to the arbitrator, claims that an "arbitration provision [is] illusory and unenforceable under Texas law" must go to arbitration.  *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 549, 550–54 (5th Cir. 2018) (applying same AAA rules at issue in *Petrofac*).  That is because an "allegation that a particular provision of the contract is illusory is properly considered a validity challenge rather than a formation challenge," and validity challenges are "arbitrability" questions for the arbitrator.  *Id.* at 551;[2] *see, e.g.*, *Ownley v. Brunel Energy, Inc.*, 2020 WL 7342677, at *2 (S.D. Tex. Dec. 14, 2020).

15.  Here, the CPR rules incorporated into the arbitration agreements require arbitration of all questions about the "scope or validity of the arbitration agreement."  Mot. at 8 (quoting *2018 CPR Non-Administered Arbitration Rules*, CPR Dispute Resolution 17 (Mar. 1, 2018)); *see also 2007 CPR Non-Administered Arbitration Rules*, CPR Dispute Resolution 14 (Nov. 1, 2007),

---

[2] *Arnold* noted that a validity challenge to a "delegation clause" specifically, rather than an arbitration provision as a whole, could be for the Court.  *See* 890 F.3d at 554.  But Katerra challenges only the latter.  *See, e.g.*, Opp. at 31 ("[T]he Arbitration Provision of the Engagement Letters are illusory[.]").

https://tinyurl.com/yeynd6ew (same). Because the parties delegated all challenges about the arbitration agreements' validity to the arbitrator, Katerra's contention that those agreements are illusory must also go to arbitration. *See Arnold*, 890 F.3d at 554.

### 2.    Katerra's "Illusory Contract" Argument Is Meritless

16.   Even if the Court were to reach the issue, it has no merit. To start, Katerra's premise— that D&T was not bound to arbitrate after completion or termination of the engagement letters— is just flat wrong: Both parties' duties to arbitrate survive completion or termination of the engagement letters. The parties' broad arbitration agreements are mutual on their face and apply to "[*a*]*ny controversy or claim between the parties* arising out of or relating to the engagement letter[s] or . . . engagement[s]." Compl., Exs. B–D, App'x E § 7 (emphasis added). Katerra completely ignores this language, along with the significant body of law holding that "[a]n arbitration agreement contained within a contract survives the termination or repudiation of the contract as a whole." *Cleveland Constr., Inc. v. Levco Constr., Inc.*, 359 S.W.3d 843, 854 (Tex. App. 2012); *see also Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 208 & n.3 (1991) (collecting cases holding that arbitration agreements generally survive termination); *Richland Equip. Co. v. Deere & Co.*, 745 F. App'x 521, 524 (5th Cir. 2018) (collecting cases holding that termination does not "automatically" extinguish arbitration rights). Just like Katerra, D&T remains bound to arbitrate regardless whether the engagement letters have been completed or terminated.

17.   Katerra instead relies exclusively on the engagement letters' general survival clause, providing that "'[t]he agreements and undertakings [of Katerra] contained in the engagement letter will survive' the 'termination of this engagement.'" Opp. at 31 (quoting Compl., Exs. B–D, App'x E § 2). Katerra posits that this clause silently erases D&T's duty to arbitrate after completion or termination, therefore giving D&T the "unilateral and unrestricted right to avoid arbitration." *Id.*

at 31–32 (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 231 n.2 (Tex. 2003)).  But the survival clause says no such thing; indeed, it says nothing at all about D&T's mutual and undisputed duty to arbitrate.  Instead, it applies most naturally to *Katerra-specific* obligations (e.g., its duties to pay audit fees and to make accurate representations to D&T), making clear that they remain enforceable even after the engagements terminate or are complete.  *See, e.g.*, Compl., Exs. B–D, App'x A, C.  Put another way, the clause means that if D&T completes or terminates the engagement, Katerra is nonetheless bound by its representations and is obligated to pay for the services that have been performed.  As a result, and given the background principle that arbitration provisions generally survive such events, the *expressio unius* principle alone—which is all Katerra points to—cannot carry the day.  *See, e.g.*, *Hurley*, 2019 WL 5537330, at *8 n.8 (rejecting argument "for the implicit nonsurvivability of the arbitration clause based on [another provision's] explicit" survival clause, which was "not sufficient to negate presumptions of arbitrability").

18.  Katerra also does not bother explaining how, even if D&T's arbitration obligations (but not Katerra's) ended after completion or termination, this would equate to a "unilateral and unrestricted right to avoid arbitration."  Katerra never suggests that D&T has a "unilateral and unrestricted right" to complete or terminate the engagement letters—indeed, it contends that the engagements remain unfinished even today.  *See* Opp. at 21–26.  Without such a right, it does not appear that—even on Katerra's tortured reading of the survival clause—D&T would have the ability to unilaterally "abolish" its arbitration obligations.  *See, e.g.*, *Randle v. Metro. Transit Auth. of Harris Cnty.*, 2018 WL 4701567, at *6 (S.D. Tex. Oct. 1, 2018) (rejecting similar argument).

19.  Last, even if D&T did have the unilateral ability to "abolish" its own arbitration obligations (and it does not), that still would not make the arbitration agreements invalid on illusoriness grounds.  The illusoriness of a promise only makes a contract invalid when it

eliminates all the consideration on one side of the bargain.  *See, e.g.*, *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005).  And "when an arbitration clause is part of an underlying contract, the rest of the parties' agreement provides the consideration."  *Id.* (contrasting this with "stand-alone arbitration agreements").[3]

20.  That is exactly the case here.  D&T made ample promises aside from the promise to arbitrate—e.g., its agreement to develop and produce audit opinions—that would, if needed, "provide[] the consideration" for Katerra's agreement to arbitrate.  *See id.* (holding that non-arbitral services by one party were sufficient consideration to make arbitration agreement valid and to reject illusoriness challenge even if the arbitration agreement were one-sided); *see also, e.g.*, *Serv. Corp. Int'l v. Ruiz*, 2018 WL 549196, at *5–6 (Tex. App. Jan. 25, 2018) (rejecting illusoriness challenge because although "neither arbitration clause show[ed] a mutual promise to arbitrate disputes[,] . . . the arbitration clauses in question [we]re not standalone agreements," but rather "part of larger, underlying contracts" for which there was sufficient consideration); *Sam Houston Elec. Coop., Inc. v. Berry*, 582 S.W.3d 282, 291–92 (Tex. App. 2017) (similar).  So even if the survival clauses meant that D&T could unilaterally avoid its arbitration obligations, Katerra would remain bound by its promise to arbitrate.

---

[3] Katerra claims that Texas law applies.  *See* Opp. at 32 n.11.  That is incorrect, because the parties agreed that New York law would apply to their disputes.  *See* Compl., Exs. B–D, App'x F.  That the choice-of-law clause says only what law the "arbitrators shall apply," Opp. at 32 n.11, does not change anything; the agreement did not specify what law "courts" were to apply because the parties agreed to have all disputes resolved by an arbitrator.  Ultimately, though, the issue is immaterial because there is no relevant difference between New York and Texas law on this issue. *See Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 135–37 (1989) (enforcing "arbitration clause compelling one party to submit all disputes to arbitration but allow[ing] the other party the choice of pursuing arbitration or litigation").  In other words, this Court need not resolve any choice-of-law dispute to decide this motion.  *See R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) ("Where there are no differences between the relevant substantive laws of the respective states, . . . a court need not undertake a choice of law analysis.").

### III.   THE BANKRUPTCY CODE DOES NOT OVERRIDE D&T'S RIGHT TO ARBITRATE KATERRA'S CLAIMS

21.  All this establishes that, based on the engagement letters, this entire lawsuit belongs in arbitration.  Katerra spends most of its opposition arguing that its bankruptcy changes everything, and that its claims should therefore be litigated in this Court.  *See* Opp. at 20–31, 33–40.  But nothing in the Bankruptcy Code allows that result.

### A.   Compelling Arbitration Will Not Conflict With The Bankruptcy Code

22.  The FAA requires courts to enforce arbitration agreements unless the party opposing arbitration shows that the FAA is "overridden by a contrary congressional command." *Shearson/Am. Exp. Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987).  Katerra does not dispute the governing law and has not shown that any of its claims should remain in this Court under that standard.  The Court should not allow Katerra to leverage its only even arguable hook—a single fraudulent transfer claim, which involves the same issues as its much more significant common law claims for professional negligence, breach of contract, and the like—to repudiate its binding agreements to arbitrate.

### 1.   Katerra's Concededly Non-Core Claims Must Be Arbitrated

23.  When it comes to non-core issues, "a bankruptcy court has no discretion to refuse to compel . . . arbitration."  *In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002).  Katerra concedes that Counts Two through Six in its complaint allege non-core claims, and gives no independent reason—i.e., aside from their association with its sole fraudulent transfer claim—why arbitration of those claims would conflict with the Bankruptcy Code or should otherwise remain in this Court. *See* Opp. at 34–39.  At a bare minimum, then, the Court must compel arbitration of Counts Two through Six.

## 2.      Katerra's Fraudulent Transfer Claim Also Must Be Arbitrated

24.   Katerra spends several pages working to establish that Count One (for fraudulent transfer) is, in fact, a core claim.  *See* Opp. at 34–36 ("The Complaint Involves a Core Claim"). But that is just the beginning of the analysis.  Even for core matters, Katerra must also show that (1) the claim "derives exclusively from the provisions of the Bankruptcy Code," *In re Gandy*, 299 F.3d at 495, and (2) arbitration would "seriously jeopardize the objectives of the Bankruptcy Code," *In re Nat'l Gypsum*, 118 F.3d 1056, 1065 (5th Cir. 1997).  Katerra has done neither.

25.   On the first point, D&T cited a number of cases holding that fraudulent transfer claims, even when brought under Sections 544, 548, and 550, do not derive exclusively from the Bankruptcy Code when they are subject to the same kind of attack outside of bankruptcy and "implicate nonbankruptcy contractual and tort claims in more than a 'peripheral manner.'" *Elite Precision Fabricators, Inc. v. Gen. Dynamics Land. Sys., Inc.*, 2015 WL 9302843, at *8 (S.D. Tex. Dec. 18, 2015) (quoting *In re Gandy*, 299 F.3d at 497); *see* Mot. at 14–16 (collecting cases). Katerra does not address those cases.  And Katerra's fraudulent transfer claim—which alleges that "Katerra did not receive reasonably equivalent value from [D&T] in exchange for [its fees] due to [D&T's] failure to perform its audit services as contractually required and as mandated by GAAS," Compl. ¶ 637—will rise or fall entirely with its non-core breach of contract and professional malpractice claims.  Because Katerra's fraudulent transfer claim repackages the other, non-core claims to manufacture core jurisdiction, it should be resolved alongside the non-core claims in arbitration.

26.   Katerra notes that *Gandy* approved the denial of a motion to compel arbitration for fraudulent transfer claims under Sections 544, 548, and 550.  *See* Opp. at 35 (also citing district court cases following that result).  But *Gandy* involved paradigmatic fraudulent transfer claims that "derive[d] entirely from the federal rights conferred by the Bankruptcy Code," rather than the

debtor's pre-petition rights; depended on the strong-arm power of the bankruptcy court; and formed "[t]he heart of Debtor's complaint."   299 F.3d at 495–97 (citation omitted).   Katerra's fraudulent transfer claim is entirely different:   It is derivative of Katerra's other, common law claims.   Specifically, Katerra alleges that D&T's audit services (provided long before Katerra's bankruptcy) were inadequate under the parties' contracts and D&T's professional standards of care, causing Katerra's fees to have been "fraudulently paid" (also years before its bankruptcy). *See* Mot. at 12, 16.   The claim will thus rise or fall with Katerra's contract, professional negligence, and related causes of action, not just the Bankruptcy Code.   *See, e.g.*, *Elite Precision*, 2015 WL 9302843, at *8.   It is also "subject to the same kind of attack by Debtor outside of bankruptcy," where Katerra could obtain the same forms of relief.   *In re Gandy*, 299 F.3d at 497.   And far from "predominat[ing]" over merely "peripheral" non-core matters, Katerra's fraudulent transfer claim simply duplicates those more numerous, and much more significant, claims.   *Id.* at 497–98; *see Elite Precision*, 2015 WL 9302843, at *8.

27.   In any event, even if Katerra were right on the first *Gandy* factor, it still cannot satisfy the second:   Arbitrating this claim would not seriously jeopardize the Bankruptcy Code's purposes. On this point, Katerra relies almost exclusively on one case: *In re Mirant Corp.*, 316 B.R. 234, 241 (Bankr. N.D. Tex. 2004).   *See* Op. at 38–39.   But far from helping Katerra, *Mirant* shows why arbitration here would not conflict with the Bankruptcy Code.

28.   As a threshold matter, *Mirant* involved creditor claims asserted *against the bankruptcy estate*—not claims brought *by the debtor* post-confirmation.   As D&T acknowledges, the former would be a different case.   Mot. at 15 (contrasting case where large claims against a debtor would have risked derailing bankruptcy); *cf. In re Mirant*, 316 B.R. at 245 n.21 (collecting cases where even claims *against* a debtor were referred to arbitration after finding no conflict).   In *Mirant*, for

12

example, the court noted that there were *many* creditors armed with arbitration agreements and claims against the estate. *See id.* at 241. Giving all such creditors stay relief to "bypass carefully established [claims] procedures in order to force an unwilling debtor to litigate a number of actions in a number of forums," the court explained, would risk chaos for debtors, and might "deplete the corpus of substantial funds." *Id.* at 241–42 (citation omitted). Here, *Katerra is the plaintiff*, and no similar concerns exist because it has chosen to sue. Indeed, Katerra's willingness and ability to bring claims outside the Bankruptcy Court is confirmed by the fact that it chose to pursue similar litigation against its former directors and officers in a Delaware court. *See* Mot. at 11, 15.

29. *Mirant* also differs from this case in another important way. There, the claim at issue was "one of the most substantial claims against [the] Debtors." *In re Mirant*, 316 B.R. at 244; *see In re Gandy*, 299 F.3d at 498 (claims at issue represented "very nearly the entirety of" the debtor's estate). Here, Katerra's sole fraudulent transfer claim is almost negligible. While the Court in *Mirant* found that the claim represented "20% of Mirant Corporation's scheduled liabilities," 316 B.R. at 244, Katerra's fraudulent transfer claim represents less than 1% of the value of the claims it asserts in this case alone, *see* Compl. ¶¶ 48, 635—and exponentially less relative to the entire estate. Because arbitration of this claim, as opposed to litigation in this Court, would have little to no effect on the estate, it cannot jeopardize the objectives of the Bankruptcy Code and should be decided in arbitration alongside the other admittedly non-core claims.

**3.    Even If The Court Does Not Compel Arbitration Of Katerra's Fraudulent Transfer Claim, It Must Still Send The Other Claims To Arbitration**

30. Even if the Court were to find that compelling arbitration of Katerra's fraudulent transfer claim would conflict with the Bankruptcy Code, that would provide no justification for keeping the non-core claims in this Court. The Fifth Circuit has made clear that, unless nonarbitrable core matters "predominate" over "peripheral" and "inconsequential" non-core

causes of action, the FAA requires enforcement of arbitration agreements as to non-core matters. *In re Gandy*, 299 F.3d at 495, 497, 500.   And most of Katerra's own cases support compelling arbitration of non-core claims regardless whether other core claims are arbitrable.  *See, e.g.*, *In re McCollum*, 2021 WL 4888327, at *3–4 (Bankr. N.D. Miss. Oct. 19, 2021) ("The non-core claims must be arbitrated," even when core claims remained in court.); *In re Try the World, Inc.*, 2021 WL 3502607, at *6, *11–13 (Bankr. S.D.N.Y. Aug. 9, 2021) (same).

31.  Katerra points to one case in which a court—confronted with four core claims and one non-core claim—nevertheless declined to compel arbitration of all five claims.  *See In re Huffman*, 486 B.R. 343, 358 (Bankr. S.D. Miss. 2013).  *Huffman* is inapposite.  In that case, the four core matters heavily "predominated" over the one non-core claim, such that the case involved "noncore matters 'in only the most peripheral manner.'"  *Id.* at 365 (quoting *In re Gandy*, 299 F.3d at 495–97).  As a result, the court found that "judicial efficiency" favored keeping all of the claims together, rather than splitting off the one state-law fraud claim for arbitration and keeping the rest in bankruptcy court.  *Id.*  Here, as explained above and below, the opposite is true.  Neither conflict with the Bankruptcy Code nor the interests of judicial efficiency could justify using Katerra's one fraudulent transfer claim as a hook to keep its five non-core claims in this Court.  *Huffman* thus provides no justification for overriding the FAA as to Katerra's concededly non-core, common law claims.

**B.     Katerra's Rejection Of Certain Executory Contracts Does Not Eliminate D&T's Arbitration Rights**

**1.     Katerra Has Not Shown That The Engagement Letters Are Executory**

32.  Katerra does not dispute that, when it filed for bankruptcy, the central obligations each party took on under the engagement letters—audit opinions by D&T, fees paid for those opinions by Katerra—were complete.  *See* Opp. at 4–13, 20–26; Mot. at 17–18.  It nevertheless spends much

of its opposition arguing that the engagement letters were executory and rejected by the plan, pointing to various obligations it contends are continuing, and therefore unperformed.  *See* Opp. at 4–13, 20–26.  As D&T has already argued, the Court need not reach this question because Katerra is wrong about rejection's effects in any event.  *See* Mot. at 18–25; *see also* Section III.B.2, *infra*.  But nonetheless, Katerra has failed to show that the engagement letters are executory because, despite all the ink spilled on this argument, Katerra makes no real attempt to show that any of the alleged continuing obligations on either side (let alone both) are material.

33.  A contract is executory under 11 U.S.C. § 365(a) only if (1) "performance remains due to some extent on both sides," *and* (2) "the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *In re Falcon V, LLC*, 44 F.4th 348, 352, 355–56 (5th Cir. 2022) (citation omitted) (finding contract not executory because remaining performance on one side was not "material"); *see In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62–63 (5th Cir. 1994) (same).  It is *Katerra's* burden to establish that the engagement letters are, in fact, executory and rejected; it is not D&T's burden to show they are not.  *See, e.g.*, *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) ("The party seeking to reject a contract bears the burden of demonstrating that it is executory.").[4]

34.  Katerra's opposition brief runs through a laundry list of ostensibly unperformed obligations under the engagement letters.  These appear to include (i) some "ongoing" obligations under GAAS; (ii) Katerra's duty to indemnify D&T and obtain D&T's consent before publishing certain documents; (iii) several Katerra obligations aimed at ensuring D&T's independence during

---

[4]  Katerra's suggestion that D&T "waived" anything on this front is thus wrong.  *See* Opp. at 21.  D&T argued that Katerra had not even attempted to show that the engagement letters here are executory.  *See* Mot. at 17–18 (noting that Katerra "just assumes" that they are).  Katerra has now tried to satisfy its burden, but—for the reasons set forth above—it has failed.

the audits; (iv) some communication obligations by both parties, also during the audits; and (v) the parties' mutual arbitration obligations.  *See* Opp. at 4–13, 24–25.

35.  But even if Katerra were right that *all* of these obligations remain unperformed on both sides,[5] it has glided past the second, central feature of an executory contract:  that both parties have at least one remaining duty that is so material that its nonperformance would "excus[e] the performance of the other party."  *In re Falcon V*, 44 F.4th at 352; *see also, e.g.*, *In re Murexco*, 15 F.3d at 62–63; *In re Goodrich Petroleum Corp.*, 554 B.R. 817, 821–22 (Bankr. S.D. Tex. 2016) (finding contract not executory where all "major obligations" of one side had been performed). Although Katerra cites a handful of cases finding specific contractual obligations to be material, *see* Opp. at 22–24 (many involving indemnification obligations for oil and gas companies and none involving audit obligations), it nowhere connects those cases to the facts or contracts here. Nor does it explain why the putatively continuing obligations it identifies would satisfy the materiality standard those cases discuss, especially when compared with D&T's primary obligation to audit and issue opinions on Katerra's financial statements, and Katerra's duty to pay the relevant audit fees.  *See* Mot. at 2 n.2, 17–18.  Katerra has thus failed to carry its burden, which is reason enough to reject its argument.

---

[5]  Katerra's argument relies heavily on the notion that auditors have continuing obligations under GAAS to revisit and revise misstated financial statements.  *See* Op. at 23–25.  But as Katerra's own Chief Transformation Officer Marc Liebman declared in support of its bankruptcy petition, Katerra and D&T jointly concluded—well before Katerra filed for bankruptcy—that "restatement of Katerra's audited financial statements for the fiscal year ended December 31, 2019 was not required."  ECF No. 37 ¶ 63.  And to the extent Katerra relies on the 2020 engagement letters and audit, that reliance is misplaced because Katerra's claims are not based on any problems with that engagement.  *See* Mot. at 2 n.2, 17–18.  In other words—whether or not GAAS obligations in some cases might persist even after an auditor issues an opinion and fees are paid— here, at the time of bankruptcy, Katerra has not identified any further such obligations with respect to the relevant engagements, much less explained how any such obligations would be "material" under governing law.

### 2. Rejection Of An Executory Contract Does Not Eliminate A Party's Right To Arbitration

36. In any event, and more fundamentally, rejection does not eliminate D&T's right to arbitrate. Both bankruptcy law and the FAA make clear that rejection under Section 365 does not terminate, void, or rescind a contract, and so does not eliminate a party's right (or a counterparty's corresponding duty) to arbitrate under it. *See* Mot. at 18–20. D&T has already shown that, for decades, courts across the country—including in this District—have embraced this rule. *See id.* at 19–21 (collecting cases). D&T has also addressed two outlier district court cases, explained why adopting their contrary rule would flout both the Supreme Court's recent explanation of how rejection works and the FAA's plain text, and showed why compelling arbitration here is perfectly consistent with Section 365's purposes. *See id.* at 21–25.

37. Katerra fails to provide any meaningful response. When it comes to the decades of precedent holding that rejection does not eliminate the right to arbitrate, *see id.* at 19–21 (collecting cases), Katerra just ignores the case law. It makes no attempt to distinguish any of the cases or explain why they are not persuasive. To the contrary, Katerra favorably cites and relies on yet another case recognizing this established rule—the *Mirant* case, albeit for other purposes. *See* 316 B.R. at 238 n.5 (explaining that, because rejection operates only as a breach of contract, "rejection does not alone prevent applicability of the arbitration clause").

38. Katerra also asks the Court to brush aside *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019)—the Supreme Court's most recent and thorough pronouncement regarding the effect of rejection in bankruptcy—on the ground that it applies only in trademark-licensing cases. *See* Opp. at 28–30. *Tempnology* did arise from a trademark dispute, but its resolution had little to do with trademark law. The Court's reasoning instead derived from "Section 365's text and fundamental principles of bankruptcy," all of which "command" the

17

conclusion that rejection "has the same consequence as a contract breach outside bankruptcy." *Tempnology, LLC*, 139 S. Ct. at 1661. "*Tempnology*'s holding," in other words, "applies to all contracts, not just trademark licenses." *In re Smylie Bros. Brewing Co.*, 2023 WL 2747858, at *3 (Bankr. N.D. Ill. Mar. 31, 2023) (quoting *In re Avianca Holdings S.A.*, 618 B.R. 684, 697 (Bankr. S.D.N.Y. 2020)); *see Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 683–84 (5th Cir. 2022) (applying *Tempnology* in the filed-rate-contract context). Indeed, courts have specifically relied on the decision to conclude that arbitration rights—like "all the rights that would ordinarily survive a contract breach"—"remain in place" after rejection. *HCB Enters., LLC v. Dickey's Barbecue Restaurants, Inc.*, 2020 WL 3643430, at *2 (D. Nev. July 6, 2020) (quoting *Tempnology*, 139 S. Ct. at 1657–58).

39.   All of this leaves Katerra with nothing more than the two outlier district court decisions that D&T has already addressed. Katerra begins by mischaracterizing *Janvey* as "Fifth Circuit precedent" on this question. *See* Opp. at 26 (citing *Janvey v. Alguire*, 2014 WL 12654910 (N.D. Tex. July 30, 2014), *aff'd on other grounds*, 847 F.3d 231 (5th Cir. 2017)). It is not; the Fifth Circuit declined to follow the reasoning on which Katerra relies. The district court in *Janvey* found that a federal equity receiver could not be compelled to arbitrate, both because arbitration would conflict with the receivership scheme and because the receiver had rejected the arbitration clause. *See id.* at *4–21. On appeal, the Fifth Circuit declined to embrace *either* rationale and expressed a reluctance to endorse "broad policy arguments in the absence of specific direction from the Supreme Court." *See* 847 F.3d at 245 & n.13. It instead affirmed on alternative grounds, holding that the receiver asserted claims on behalf of a party that had not consented to arbitration (and that another party had waived its arbitration rights). *See id.* at 240–44. There is no "Fifth Circuit precedent" supporting Katerra's position here.

40.  Still relying on its two district court cases, Katerra insists that rejection means it "cannot be compelled to specifically perform pursuant to the arbitration provision[s]," and can only be liable for damages resulting from its refusal to arbitrate.[6]  Opp. at 26–28 (discussing *In re Highland Cap. Mgmt., L.P.*, 2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021); and *Janvey*, 2014 WL 12654910.  But as D&T explained, that would eliminate a core right granted by the FAA, would violate the principle that "all the rights that would ordinarily survive a contract breach . . . remain in place after rejection," and would do little to further Section 365's purposes.  *See* Mot. at 21–25.  Katerra fails to engage with any of this.

41.  Further, the main premise on which *Highland*, *Janvey*, and Katerra rely—that specific performance is "not available" under a rejected contract—is inaccurate.  *See* Opp. at 27 (quoting *In re Highland*, 2021 WL 5769320, at *7).  In support, *Janvey* (followed by *Highland* and, now, Katerra) mainly relied on a 1983 law review article broadly asserting that "injured part[ies] cannot insist on specific performance by the trustee."  *Janvey*, 2014 WL 12654910, at *9 (quoting Jay Lawrence Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 Minn. L. Rev. 595, 619 (1983)); *see In re Highland*, 2021 WL 5769320, at *7 (same); Opp. at 27 (same).  But the reality is much more complicated:  Nothing in the Bankruptcy Code's text bars specific performance.  And the case law makes clear that there is no ironclad rule against it.  Instead, "[t]he policy rationale" against specific performance in bankruptcy is usually "that specific performance should not be permitted where the remedy would in effect do what § 365 of the Code can avoid, that is, . . . impos[e] . . . burdensome contracts on the debtor."  *In re Baerg*

---

[6]  Katerra confusingly refers to a $2 million claim D&T could have asserted against it "for services performed for the audit of Katerra's 2020 financial statements," which Katerra never paid for.  Opp. at 28.  It is unclear what that has to do with a breach of the parties' arbitration agreements.  But as explained before and above, the remedy for the latter—both in and outside bankruptcy—is an order compelling arbitration.  *See* Mot. at 22–24.

*Real Prop. Tr.*, 585 B.R. 373, 390 (N.D. Tex. 2018).  But when "these policy concerns are not an issue" and the law calls for equitable relief, "[c]ourts within the Fifth Circuit have not limited remedies for claims solely to monetary damages." *Id.* (collecting cases).

42.  Indeed, as even Professor Westbrook has acknowledged, that is true for rejected executory contracts, too—including where the substantive law makes clear there is no adequate monetary relief that could be converted into a "claim" under 11 U.S.C. § 101(5)(B).  *See* Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227, 269–70, 336 (1989) (recognizing that parties can obtain specific performance of rejected contracts in certain circumstances where state law calls for it and monetary remedies are insufficient to enforce the interest at issue); *see also, e.g.*, *In re The Ground Round, Inc.*, 335 B.R. 253, 262 (B.A.P. 1st Cir. 2005) ("Although the Debtor cites case law to support its argument that there is no right to specific performance of a contract rejected in bankruptcy, the result is different where there is no available monetary remedy." (footnote omitted)), *aff'd*, 482 F.3d 15, 18–19 (1st Cir. 2007) (noting that sometimes "a specific performance right to property under state law is left undisturbed and should be enforced" even after rejection); Stephen J. Ware, *Arbitration Agreements As Executory Contracts in Bankruptcy After* Mission Prod. Holdings, Inc. v. Tempnology, LLC, 96 Am. Bankr. L.J. 769, 781–92 (2022) (explaining why courts can, should, and often do compel arbitration under rejected contracts).

43.  That is precisely the case here.  The policy concerns against specific performance do not apply:  (1) D&T is not seeking to impose extensive contractual burdens on Katerra, or claim a disproportionate share of the estate, (2) Katerra has already made the decision to pursue a claim against D&T, voluntarily undertaking the costs of litigation that would attend in any forum, and (3) D&T simply asks the Court to enforce the parties' pre-petition choice of forum for the claims

Katerra has asserted.  It is therefore hard to see how enforcing the arbitration provisions imposes any greater burden on Katerra than it has already voluntarily assumed by suing D&T.  Moreover, the FAA's plain text mandates specific performance in the form of an order compelling arbitration, based on Congress's recognition that money damages are an inadequate remedy when a party refuses to abide by its agreement to arbitrate.  *See* Mot. at 23–24.  In these circumstances, compelling arbitration is fully consistent with Section 365.

## IV.   THE COURT MAY STAY THIS PROCEEDING PENDING ARBITRATION, BUT SHOULD NOT STAY ARBITRATION PENDING LITIGATION

44.   Katerra argues that, if the Court compels arbitration of all its claims, the Court should stay proceedings pending arbitration, not dismiss.  *See* Opp. at 40.  D&T has no issue with that resolution.  Although the Court may dismiss this proceeding entirely after compelling arbitration, a stay pending arbitration would be an appropriate exercise of its discretion.

45.   But Katerra then goes further and argues that, if the Court compels arbitration of some, but not all, of its claims, it should stay arbitration of those claims pending litigation.  *See id.* at 39–40.  That is inappropriate where, as here, the sole claim to be litigated would be "the rather small tail to a much larger dog"—which would, in any event, depend on the outcome of the arbitrable, non-core, common law claims.  *See, e.g.*, *Sibley v. Tandy Corp.*, 543 F.2d 540, 543–44 (5th Cir. 1976) (holding that a securities claim, which was not arbitrable under then-existing Supreme Court precedent, had to be stayed pending arbitration of five breach of contract claims when the securities claim was "'dependent' upon the contract claims"); *Harvey v. Joyce*, 199 F.3d 790, 795–96 (5th Cir. 2000) (staying litigation pending arbitration where claims in both proceedings were "based on the same operative facts and [were] inherently inseparable"); *Qualls v. EOG Res., Inc.*, 2018 WL 2317718, at *2 (S.D. Tex. May 22, 2018) (staying litigation pending arbitration under these precedents).

46. Katerra's cases from the bankruptcy context reinforce that conclusion.  As *Try the World* detailed, stays of bankruptcy proceedings pending arbitration are appropriate when arbitrable claims predominate over nonarbitrable claims; there are common questions among the claims or arbitration is "likely to dispose of issues common to" all claims; or "the stay will promote judicial economy, avoidance of confusion and possible inconsistent results without working an undue hardship or prejudice against the plaintiff."  2021 WL 3502607, at *14 (first quoting *In re S.W. Bach & Co.*, 425 B.R. 78, 98 (Bankr. S.D.N.Y. 2010); and then quoting *In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 199 (Bankr. S.D.N.Y. 2002)).  In the specific context of fraudulent transfer claims, the court explained, litigation should be stayed when the "fraudulent conveyance claims [are] directly connected to [] contract disputes," "the arbitration and the fraudulent conveyance litigation share[] common questions of fact," and the fraudulent transfer claim "depend[s] on . . . the issue that the trustee would litigate in the arbitration."  *Id.* (discussing *In re Hagerstown*, 277 B.R. at 208, which stayed litigation of Section 544 fraudulent transfer claims in bankruptcy court pending arbitration of common law claims).

47. If the Court declines to compel arbitration of the fraudulent transfer claim (though it should not), all of these considerations would counsel staying litigation of that claim pending arbitration—especially because the former will necessarily turn on the latter and because the bankruptcy plan has already been confirmed.  *See supra* at 12.  Katerra does not explain how doing the opposite would be at all rational or efficient, and does not identify any prejudice it would suffer from arbitrating first, and then litigating its much smaller fraudulent transfer claim (if still viable and necessary).  Although it notes that *simultaneous* litigation and arbitration could be wasteful, *see* Opp. at 39–40, that is all the more reason to compel arbitration of all claims or, at least, stay the one tag-along claim, while letting the bulk of the case proceed in arbitration.

## V.     CONCLUSION

48.  For all these reasons, and the reasons set forth in D&T's motion to compel arbitration, the Court should (1) compel Katerra to arbitrate its claims in accordance with the engagement letters' arbitration provisions, (2) stay this proceeding pending arbitration or dismiss, and (3) grant such other and further relief as is just and proper.

Dated: April 18, 2023

By:  */s/ John F. Higgins*

Jamie L. Wine (*pro hac vice*)
Adam B. Shamah (*pro hac vice*)
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-2904
Email:  jamie.wine@lw.com

Melissa Arbus Sherry (*pro hac vice*)
Jordan R. Goldberg (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, NW
Washington, DC 20004
Telephone:  (202) 637-2200
Email:  melissa.sherry@lw.com

John F. Higgins, Esq.
(Tex. Bar No. 09597500)
Porter Hedges LLP
1000 Main Steet, 36th Floor
Houston, TX 77002
Telephone:  (713) 226-6000
Facsimile:  (713) 226-6248
Email:  jhiggins@porterhedges.com

*Counsel for Deloitte & Touche LLP*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 18, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins